No. 102,527

STATE OF KANSAS, *Appellee*, v. JESSICA D. CUMMINGS, *Appellant*.

(305 P.3d 556)

Opinion filed June 28, 2013.

*Lydia Krebs*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: Jessica D. Cummings seeks our review of the Court of Appeals decision that affirmed her conviction for involuntary manslaughter based on the underlying crime of endangering a child. Cummings contends that the district court should have supplemented the pattern jury instruction on the elements of endangering a child, PIK Crim. 3d 58.10, by explaining to the jury what was meant by "reasonable probability." We agree and find that the failure to define "reasonable probability" was clearly erroneous. Accordingly, we reverse and remand for a new trial with a clarifying instruction on the elements of the crime of endangering a child.

### Factual and Procedural Overview

Jessica Cummings provided daycare services for children in her home. On March 25, 2008, Cummings was caring for 13-month-old K.H., along with her own daughter and two other children. At 9 a.m., Cummings gave K.H. a bottle and placed her in a playpen in Cummings' bedroom where Cummings' adult sister was sleeping. Because K.H. was being too noisy, Cummings' sister moved K.H. to another bedroom where another child was sleeping. At 10 a.m., Cummings decided to move K.H. again so that she would not disturb the sleeping child. Cummings gave K.H. a pacifier and placed her into a car seat, fastening the car seat's top strap, but not the bottom strap. Cummings placed the car seat in a bathroom off of the kitchen, facing the seat toward the door and leaving the door open about 7 or 8 inches.

Cummings went approximately three to four steps away from the bathroom and into the kitchen to prepare lunch for the other children. Cummings heard K.H. crying for about 2 to 5 minutes and then K.H. was quiet; Cummings assumed K.H. had gone to sleep. Cummings did not visually check on K.H. again until 12:30 p.m., at which time Cummings discovered K.H. was not breathing. The child had strangled to death in the car seat.

The State charged Cummings with involuntary manslaughter, alleging that she unintentionally killed K.H. during the commission of the crime of endangering a child. The case proceeded to a jury trial, at which a forensic pathologist, Deborah Johnson, testified that the autopsy of K.H. revealed that the child had died of asphyxia due to ligature strangulation. Although Johnson had heard of deaths occurring like this one, they were not common, and she had not personally dealt with a car seat strangulation case during her 12 years of practicing forensics. In fact, Johnson had placed K.H.'s body in the car seat to determine whether strangulation by car seat was even possible. She opined that K.H. was too big for the car seat and that the child's weight had caused the car seat to tip forward, putting more weight on the child's neck. However, Johnson testified that even a larger car seat that was improperly fastened could have caused the same result, which is the reason

that a child should never be left unattended in a car seat, as noted on the car seat's warning label.

Detective Wendy Hummell testified at trial, informing the jury that the purpose of the car seat's bottom strap between the child's legs is to keep the child from slipping or falling out of the car seat. Hummell noted that the car seat's instructions stated that it was designed for a child age 1 year and under and weighing less than 20 pounds. K.H. was 13 months old and weighed 23 pounds. One of the warning labels on the car seat said: "[C]hild can strangle in loose restraint straps. Always use harness. Never leave child in carrier when straps are loose or undone." Hummell declared that it was not proper to put a child in the car seat without strapping the child into the seat. But the detective admitted that she had never investigated a death that had resulted from a child being in a car seat.

Cummings testified on her own behalf. She told the jury that she thought the car seat was a safe place for a child to sleep. She related that she had previously placed other daycare children in the car seat when they were fussy; that one of the children she cared for would only sleep in a car seat, as the child's mother was aware; that Cummings' own daughter frequently slept in the car seat; and that Cummings had never experienced any problem having a child sleep in a car seat. She had specifically never had any issue with K.H. rocking forward in the car seat, and on the day in question she had placed the car seat's handle close to the ground to prevent it from rocking. On cross-examination, however, Cummings admitted that during her daycare orientation she was informed of the requirement that napping periods be supervised. She was also informed that children under 18 months old are to be placed in either a crib or playpen for naps. See K.A.R. 28-4-116(b)(2)(A).

The jury found Cummings guilty, and the court sentenced her to 32 months in prison. Cummings filed a timely appeal with the Court of Appeals, which affirmed her conviction in a split decision. The Court of Appeals dissent opined that the endangering a child jury instruction was clearly erroneous because it failed to accurately explain what the State was required to prove in order to find a

"reasonable probability" that K.H.'s life, body, or health would be injured or endangered. *State v. Cummings*, 45 Kan. App. 2d 15, 28-29, 243 P.3d 697 (2010) (Leben, J., dissenting). The majority found that the term "reasonable probability" was a risk assessment readily comprehensible by a jury, that supplementing the instruction would have been redundant, and that the Kansas Supreme Court has acknowledged that the current version of the endangering a child jury instruction provides the proper legal standard for determining whether a violation of K.S.A. 21-3608(a) has occurred. 45 Kan. App. 2d at 24-25.

Cummings sought our review, stating the issue as: "The district court erred in failing to instruct the jury that a 'reasonable probability' is 'something more than a faint or remote possibility,' and 'a likelihood that harm to the child will result or that the child will be placed in imminent peril.' " We granted review on the instruction issue.

## ENDANGERING A CHILD JURY INSTRUCTION

Cummings contends that the fact that K.H. died after Cummings placed her in a car seat with only the top strap fastened was insufficient, by itself, to establish the crime of endangering a child. Rather, Cummings argues the State had to prove she knew, at the time she placed the child in the car seat, that a reasonable probability the child's life, body, or health would be injured or endangered was "something more than a faint or remote possibility" and that there was "a likelihood that harm to the child [would] result or that the child [would] be placed in imminent peril." Accordingly, she argues that it was clearly erroneous to fail to explain to the jury that it could not convict her of involuntary manslaughter if it believed that the child's death was the result of a "freak accident" instead of the crime of endangering a child.

### Standard of Review

Cummings did not object to the endangering a child jury instruction below. Therefore, our standard of review is governed by K.S.A. 22-3414(3) and *State v. Williams*, 295 Kan. 506, 286 P.3d 195

(2012). In *Williams*, we explained that a jury instruction issue, like all issues on appeal, is subject to a three-step process:

"(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless." *Williams*, 295 Kan. 506, Syl. ¶ 1.

Regarding the first step, we recognized that K.S.A. 22-3414(3) creates a procedural hurdle for a party that fails to object to or request a jury instruction:

"K.S.A. 22-3414(3) establishes a preservation rule for instruction claims on appeal. It provides that no party may assign as error a district court's giving or failure to give a particular jury instruction, including a lesser included crime instruction, unless: (a) that party objects before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds for objection; or (b) the instruction or the failure to give the instruction is clearly erroneous. If an instruction is clearly erroneous, appellate review is not predicated upon an objection in the district court." *Williams*, 295 Kan. 506, Syl. ¶ 3.

The determination of whether an instruction is clearly erroneous employs a two-step process. First, "the reviewing court must . . . determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record." *Williams*, 295 Kan. 506, Syl. ¶ 4. Here, the legal appropriateness of the endangering a child instruction hinges upon whether it adequately explained to the jury what claims the State had to prove beyond a reasonable doubt to support a conviction.

If error is found, then the second step is for the court to assess "whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." *Williams*, 295 Kan. 506, Syl. ¶ 5; see *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 (2013).

*Analysis*

The instruction under attack in this appeal mirrored the language of PIK Crim. 3d 58.10 and recited as follows:

"The elements of endangering a child are as follows:

"1. That the defendant intentionally and unreasonably caused or permitted [K.H.] to be placed in a situation in which there was a *reasonable probability* that [K.H.]'s life, body or health would be injured or endangered;

"2. That [K.H.] was then a child under the age of 18 years; and

"3. That this act occurred on or about the 25th day of March, 2008, in Sedgwick County, Kansas." (Emphasis added.)

Cummings argues that the instruction did not adequately inform the jury that a "reasonable probability" means "something more than a faint or remote possibility," and that there must be "a likelihood that harm to the child will result or that the child will be placed in imminent peril." See *State v. Sharp*, 28 Kan. App. 2d 128, 135, 13 P.3d 29 (2000); PIK Crim. 3d 58.10, Comment. Cumming's argument is founded upon the prior appellate decisions that have narrowly construed the statute in order to uphold its constitutionality. Accordingly, a brief historical review is in order.

The misdemeanor crime of endangering a child is defined by statute as "intentionally and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health *may* be injured or endangered." (Emphasis added.) K.S.A. 21-3608(a). This statute was enacted in 1969, and the language in place at the time of Cummings' alleged criminal acts dates back to 1993. See L. 1993, ch. 291, sec. 59; L. 1992, ch. 298, sec. 36; L. 1969, ch. 180, sec. 21-3608.

In *State v. Fisher*, 230 Kan. 192, 631 P.2d 239 (1981), the predecessor to K.S.A. 21-3608(a) (then K.S.A. 21-3608[1][*b*] [Ensley]) was challenged as being unconstitutionally vague. The *Fisher* court endeavored to fulfill its duty to construe a statute in a manner that would uphold its constitutionality, where possible. See *State v. Gaona*, 293 Kan. 930, 958, 270 P.3d 1165 (2012) (courts must interpret statute in way that makes it constitutional unless to do so violates legislative intent). Ultimately, *Fisher* recited:

"The purpose of K.S.A. 21-3608(1)(*b*) is salutary. It is to protect children, and to prevent their being placed where it is *reasonably certain that injury* will result.
. . .

"The wording of the statute is broad, but the purpose is likewise broad; to prevent people from placing children in situations where their lives and bodies *are obviously in imminent peril.* . . . We conclude that K.S.A. 21-3608(1)(*b*) is clear and understandable; that ordinary persons can determine what conduct is proscribed by a common-sense reading of the statute; that the statute conveys a sufficiently definite warning when measured by common understanding; and that it is not void for vagueness." (Emphasis added.) 230 Kan. at 199-200.

But in reaching its result, *Fisher* determined that it was necessary to narrowly construe the language defining the crime of endangering a child, specifically finding that the word "may" "means something more than a faint or remote possibility; it means that there is a reasonable probability, a likelihood that harm to the child will result." 230 Kan. at 195.

The constitutionality of K.S.A. 21-3608(a) was again challenged in *State v. Wilson*, 267 Kan. 550, 987 P.2d 1060 (1999), albeit under a different factual pattern. Wilson took the tack that the statute was unconstitutionally vague because it criminalized conduct and activities which are obviously lawful, such as permitting one's child to play football, where injury is highly likely. Relying on *Fisher*, this court again held that the endangering a child statute was not unconstitutionally vague. 267 Kan. at 556. The *Wilson* court rejected the defendant's facially seductive argument by declaring that "courts will not give strained meanings to legislative language through a process of imaginative hypothesizing; a common-sense interpretation of the statute is the guiding principle." 267 Kan. at 557. The court then opined that the statute only prohibits "unreasonably" permitting a child to be placed in dangerous circumstances, which would ostensibly foreclose prosecution of a parent who permitted a child to play football, for example. 267 Kan. at 557-58.

The dilemma of how and when to hold an adult criminally responsible for causing or permitting a child to be placed in dangerous circumstances arose once again in *Sharp*, 28 Kan. App. 2d 128. In *Sharp*, a Court of Appeals panel was presented with the question of the efficacy of the version of PIK Crim. 3d 58.10 in effect at that time. The pattern instruction had substituted the word "might" where the statute used the word "may." 28 Kan. App. 2d

at 133. The instruction stated, in relevant part: "That the defendant intentionally and unreasonably caused or permitted [a child] to be placed in a situation in which [the child]'s life, body or health *might* be injured or endangered." (Emphasis added.) See PIK Crim. 3d 58.10 (1993); see also PIK Crim. 3d 58.10 (1999 Supp.) (containing the same relevant language).

The *Sharp* panel found that it was clear error for the trial court to fail to define the word "might" for the jury, reasoning that although *Fisher* had found that K.S.A. 21-3608(a) was constitutional, *Fisher's* "discussion on the different meanings of the word 'may' iterates why it is important that that particular word be defined in the context of this statute." 28 Kan. App. 2d at 134. Therefore, the instruction's use of the word "might," relying upon its ordinary meaning without further definition, was not legally sufficient to inform a conviction for endangering a child. 28 Kan. App. 2d at 134. The *Sharp* panel concluded:

"The ordinary or normal meaning of the word 'may' was specifically rejected by the *Fisher* court in favor of a definition containing a legal standard: reasonable probability. 230 Kan. at 195. There is a very real possibility, especially under the facts of this case, that the jury would have returned a different verdict had the term 'might' been properly defined as more than a faint or remote possibility, a reasonable probability, a likelihood that harm to the child will result or that the child will be placed in imminent peril. See Comment to PIK Crim. 3d 58.10." 28 Kan. App. 2d at 135.

After *Sharp*, PIK Crim. 3d 58.10 was amended to remove the word "might" and replace it with the following phrasing: "That the defendant intentionally and unreasonably caused or permitted [a child] to be placed in a situation in which *there was a reasonable probability that* [the child]'s life, body or health *would* be injured or endangered." (Emphasis added.) PIK Crim. 3d 58.10 (2000 Supp.); see also PIK Crim. 3d 58.10 (2006 Supp.) (containing the same language). Cummings argues that while the post-*Sharp* version of PIK Crim. 3d 58.10 is preferable to the old version, it still fails to accurately and thoroughly define endangering a child for the jury. The State, on the other hand, argues that the instruction used in this case contains the precise language that the *Fisher* and *Sharp* courts found to be critical to the analysis, *i.e.,* "reasonable

probability"; and, therefore, the instruction reflects the proper legal standard. The State does not discuss *Wilson's* "common-sense" distinction between activities, such as playing football and napping in a car seat.

The Court of Appeals decided *Cummings* before our decision in *Williams* clarified the analytical process for instruction challenges raised for the first time on appeal. Therefore, the panel did not separately consider whether the instruction was legally and factually appropriate before concluding that the instruction was not clearly erroneous. The majority stated three reasons that it believed the instruction was not clearly erroneous:

"First, we find 'reasonable probability' to be a risk assessment readily comprehensible to a jury; in other words, a jury would not be misled or confused by the instruction. Second, we find it redundant to instruct a jury that 'reasonable probability' means 'more than a faint or remote possibility' and 'a likelihood.' Supplementing the instruction with redundant phrases and legalese necessarily works to impede, rather than assist, the jury in executing its duties. Third, our Supreme Court has acknowledged the post-*Sharp* version of PIK Crim. 3d 58.10 is the proper legal standard to consider in determining whether a violation of K.S.A. 21-3608(a) had occurred." *Cummings*, 45 Kan. App. 2d at 24-25.

To support its third point that the Supreme Court had acknowledged PIK Crim. 3d 58.10 as stating the proper legal standard for determining a violation of the endangering a child statute, the Court of Appeals relied upon *State v. Daniels*, 278 Kan. 53, 91 P.3d 1147, *cert. denied* 543 U.S. 982 (2004). *Cummings*, 45 Kan. App. 2d at 23. As the Court of Appeals dissent pointed out, the issue in *Daniels* was the sufficiency of the evidence to support a conviction for endangering a child; Daniels did not challenge the efficacy of the elements instruction given in that case. *Cummings*, 45 Kan. App. 2d at 31 (Leben, J., dissenting).

Granted, in finding sufficient evidence to support Daniels' conviction, the opinion gratuitously offered that PIK Crim. 3d 58.10 had been modified to reflect the standard set forth previously in the *Sharp* decision. *Daniels*, 278 Kan. at 72-73. From that, one might discern that *Daniels* was suggesting that the elements instruction in that case had been legally appropriate. Recently, we made the following observation about relying on dicta: "Dicta in a

court opinion is not binding, even on the court itself, because the court should consider the issue in light of the briefs and arguments of counsel when the question is squarely presented for decision." *Law v. Law Company Building Assocs.*, 295 Kan. 551, Syl. ¶ 1, 289 P.3d 1066 (2012). The issue before us today poignantly illustrates that point.

*Fisher, Wilson,* and *Sharp* appear to have hinted at the inherent problems with ensuring that a jury understands and finds the appropriate level of culpability to support a conviction under our endangering a child statute. Recently, a commentator has given voice to the problematic interplay between criminal child neglect laws and parenting styles, observing that while the legal system has historically trusted a defendant's neighbors and fellow citizens to determine what reasonable behavior is, a jury's verdict in this context is often made "without any evidence of what constitutes a statistically-significant probability of feared or anticipated harm." Pimentel, *Criminal Child Neglect and the "Free Range Kid": Is Overprotective Parenting the New Standard of Care?*, Utah L. Rev. 947, 987 (2012). The commentator explained that jurors tend to exaggerate a risk when the facts are related to a specific person or persons, *i.e.*, humanized:

"If people can put a human face on the risk and tell the story of the harm to a child or a family, they will systematically exaggerate that risk. Josef Stalin understood this principle, noting, 'A single death is a tragedy, a million deaths is a statistic.' This tendency explains why 'people gloss over statistics of automobile deaths, but when the press writes page after page about nine people trapped in a mine—complete with human-interest stories about their lives and families—suddenly everyone starts paying attention to the dangers with which miners have contended for centuries.'" Utah L. Rev. at 984.

Likewise, jurors are susceptible to the risk of hindsight bias when a child actually suffers harm:

"The case may seem easier if the child does in fact come into harm as a result of the parent's choice to pursue a more laissez-faire parenting style. In that case, a prosecutor may feel the need to vindicate the wrong. However, there is a flaw in this reasoning as well. If a parent exposes a child to a one-in-twenty risk of serious harm, the parent might be deemed to have breached the standard of care; in other words, the 5% probability of harm might be considered by the jury to be an unreasonable risk. The wrongfulness of the parent's act is the same whether

or not the child comes to harm, but to a jury the fact of actual harm may be taken as proof that the parent's choice was unreasonable. If the risk of harm is literally one in a million—in the category of 'freak accident'—it would be patently unreasonable to expect any significant investment in precaution against that harm. *And yet, every time that freak accident occurs, the parent may face liability for endangerment, as jurors are likely to take the fact of the harm itself as conclusive evidence of its likelihood:* '[h]ere's the problem—what might seem prudent precaution before an accident occurs might appear, in hindsight, to have been imprudent. That is, if an accident has occurred, the hindsight bias may tell us that the accident was more inevitable than we would have thought before.'

"When the child is not harmed, the situation is far more compelling for the parent to be let off with a warning, and with a lesson learned." (Emphasis added.) Utah L. Rev. at 980-81.

The commentator further suggests that the risk distortion in child neglect prosecutions is exacerbated by statutory vagueness:

"[C]hild neglect statutes are vague, and because everything a parent does exposes the child to some risk, the only thing that stands between parents and jail is the prosecutor's determination in the charging phase and the jury's determination in the guilt phase that the parents' actions or risks were 'unreasonable.' Accordingly, if jurors overestimate the risks to children, they are likely to find parental conduct that fails to take precautions against these exaggerated risks to be unreasonable." Utah L. Rev. at 986.

Recently, in *State v. Chavez*, 146 N.M. 434, 211 P.3d 891 (2009), the New Mexico Supreme Court reviewed and reflected upon its past interpretation of that state's child endangerment statute. In the process, the *Chavez* court discussed the need for specific evidence explaining the actual risk that the infant child faced to ensure that the conviction was based on science and not emotion, noting: "Natural factors of sympathy and even outrage in the face of an infant death can create a perilous situation where judgment is based on emotion and not evidence." 146 N.M. at 447. We follow that lead and pause to reassess whether the use of the phrase "reasonable probability," without more, adequately instructs the jury on the level of culpability it must find to convict a person of endangering a child.

The Court of Appeals majority opined that " 'reasonable probability' [is] a risk assessment readily comprehensible to a jury; in other words, a jury would not be misled or confused by the instruction," but to the contrary it would have been redundant and con-

fusing to further define the term. *Cummings*, 45 Kan. App. 2d at 24. In *State v. Adams*, 292 Kan. 151, 168, 254 P.3d 515 (2011), we provided district courts with a definition of "reasonable probability," as that term is used in the second prong of the test for ineffective assistance of counsel, stating that it meant " 'a probability sufficient to undermine confidence in the outcome.' " 292 Kan. at 168 (quoting *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 [1985]). One might find it ironic that this court found it necessary to define "reasonable probability" for *judges* if we believed that it was a readily comprehensible risk assessment for laypersons on a jury.

In contrast, the dissent found ambiguity in the term "reasonable probability," pointing out that it is unclear whether something with a "reasonable probability" of occurring happens more—or less—frequently than something with a "probability" of occurring. The dissent believed that *Fisher* had sought additional precision by adding the phrase "a likelihood that harm to the child will result," after "reasonable probability." *Cummings*, 45 Kan. App. 2d at 26 (Leben, J., dissenting). We agree. Moreover, the ambiguity conflicts with the holding in *Sharp* that a jury must be told that to convict of endangering a child, the defendant's acts must have caused "a reasonable probability, a likelihood that harm to the child will result." 28 Kan. App. 2d at 135.

Ultimately, the Court of Appeals dissent concluded that the endangering a child statute should be construed "to require that harm to the child was more likely to occur than not from the defendant's conduct." 45 Kan. App. 2d at 28 (Leben, J., dissenting). That conclusion was based upon four factors: (1) The combination of "a reasonable probability" and "a likelihood" under circumstances that suggested the use of "ordinary, prototypical meanings, not alternate definitions"; (2) the fact that the limitation on the meaning of the statutory term "may" was put in place to counter a "void-for-vagueness challenge," and the key test requires that the statute gives adequate warning as to the conduct that is illegal; (3) the rule of lenity, which requires that the criminal statute be narrowly interpreted in favor of the accused; and (4) the language used in

*Fisher, i.e.,* " 'a likelihood that harm . . . *will* result.' " 45 Kan. App. 2d at 27-28 (Leben, J., dissenting).

We share the dissent's concerns about the ambiguity of the term "reasonable probability" and its inability to ensure that convictions for endangering a child will not be premised upon less culpability than the criminal statute requires in order to maintain its constitutional validity. While our cases have indicated that the purpose of the endangering a child statute is broad, they have also clarified that it was not meant to criminalize all conduct that could potentially lead to harm to a child. In *Fisher,* we noted that "[t]he wording of the statute is broad, but the purpose is likewise broad; to prevent people from placing children in situations where their lives and bodies are *obviously in imminent peril.*" (Emphasis added.) 230 Kan. at 199. In *Wilson,* we cautioned against overly expansive application of the statute: "This court does not question that the goal of K.S.A. 21-3608 is to protect children from abuse and neglect, but this does not mean we should expand criminal liability to every circumstance which would arguably protect children despite the statute's express or implied limitations." 267 Kan. at 567.

Accordingly, we hold that, without further clarification, the term "reasonable probability" creates an ambiguity for the jury as to the level of risk that constitutes criminal conduct. The problem associated with this ambiguity is real; a defendant could be convicted based on the jury's misunderstanding of the level of culpability that our endangering a child statute requires. The severity of this problem increases because of hindsight bias and risk distortion. The pattern instruction given, therefore, was not legally appropriate.

Before proceeding to assess the reversibility of the instruction error, we pause to offer some guidance on what the instruction should state. As noted, the Court of Appeals dissent suggested that the phrase "more likely than not" could be used to describe reasonable probability. *Cummings,* 45 Kan. App. 2d at 27 (Leben, J., dissenting). While that simple solution has some practical appeal, it is not free of risk, as suggested by the New Mexico Supreme Court.

*Chavez* found that New Mexico's child endangerment statute's "reasonable probability or possibility" standard created uncer-

tainty, which led the court to seek a more precise terminology that could be employed to describe the degree of risk to which a child must be exposed before the risk constitutes criminal child endangerment. 146 N.M. at 439. In that vein, *Chavez* declined to adopt a strict mathematical probability standard, explaining as follows:

"However, we acknowledge there are many situations that may not produce a strict mathematical probability of harm, but nevertheless endanger a child. For example, if a defendant placed one bullet in a six-shot revolver, spun the chamber, placed the pistol to the child's head, and pulled the trigger, the risk that the child will suffer a lethal shot is only 16.67%, less than a statistical probability. Yet few would doubt the very real and unacceptable risk of harm to the child.

"Even more problematic are situations such as the present case, where the probability of harm cannot easily be measured or accurately quantified as a mathematical statistic. Therefore, a standard that requires proof of a strict probability under all circumstances poses too rigid a bar in its application. For these reasons, it is apparent that neither probability nor possibility provides an accurate, universal description of legislative intent." 146 N.M. at 440.

*Chavez*' reasoning against adopting a strict probability standard is supported by our discussion of the word "unreasonably" in the endangering a child statute in *Fisher*:

" 'It is true that no hard and fast rule can be stated that would set an obvious standard of conduct in every factual situation. No such standard is required. The fact that the prescribed standard of conduct in a criminal statute may be one of varying degree dependent upon the factual circumstances in each case does not make a criminal law unconstitutional. As Mr. Justice Holmes of the United States Supreme Court said in *Nash v. United States*, 229 U.S. 373, 57 L. Ed. 1232, 33 S. Ct. 780 (1913):

' "[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. 'An act causing death may be murder, manslaughter, or misadventure, according to the degree of danger attending it' by common experience in the circumstances known to the actor. . . . 'The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.' " ' " *Fisher*, 230 Kan. at 193-94 (quoting *State v. Randol*, 226 Kan. 347, 351, 597 P.2d 672 [1979]).

Instead of a strict probability standard, *Chavez* found that the explanation of New Mexico's *mens rea* element of reckless disregard, which provides that the "defendant's conduct created a *substantial and foreseeable risk*" of harm, more closely aligned with

New Mexico's legislative purpose "to punish conduct that creates a truly significant risk of serious harm to children." 146 N.M. at 440; see New Mexico Uniform Jury Instruction 14-604. The court then set forth several factors to consider when determining if the risk created by a defendant's conduct is substantial and foreseeable: the gravity of the threatened harm, the legislature's independent assessment that conduct is inherently perilous, and, although no longer determinative in New Mexico, the likelihood that harm will occur. 146 N.M. at 440-41.

*Chavez* illustrated the legislature's independent assessment factor by pointing out that marijuana is inherently perilous because the legislature has separately criminalized possession and distribution of it. 146 N.M. at 441. But we would add that a regulatory body's assessment that conduct is inherently perilous is an appropriate consideration as well. For example, here, the Kansas Administrative Regulations applicable to daycare centers could suggest that some types of conduct are inherently perilous.

Accordingly, we conclude that, while the likelihood that harm will occur is a relevant consideration, it is not the sole consideration the jury must weigh in reaching its decision. Instead, the jury should be instructed on three considerations: (1) the gravity of the threatened harm, (2) the legislature's or regulatory body's independent assessment that the conduct is inherently perilous, and (3) the likelihood that harm to the child will result or that the child will be placed in imminent peril. Further, the instruction must explain that the term "likelihood" means more than a faint or remote possibility. To ensure that a defendant is not convicted under a standard requiring less culpability than the law requires, while also allowing the jury to consider factors outside of the strict mathematical probability, PIK Crim. 3d 58.10 should be supplemented with clarifying language such as the following:

In determining if there was a reasonable probability that [the child's] life, body, or health would be injured or endangered, you should consider (1) the gravity of the threatened harm, (2) the legislature's or regulatory body's independent assessment that conduct is inherently perilous, and (3) the likelihood that harm to the child will result or that the child will be placed in imminent peril. "Likelihood" means more than a faint or remote possibility.

Returning to the analysis of the instruction error in this case, we move to the reversibility determination after finding that the instruction given was legally erroneous. The test is whether this court is " 'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.' " *State v. Trujillo*, 296 Kan. 625, 631, 294 P.3d 281 (2013) (quoting *Williams*, 295 Kan. at 516).

We begin by pointing out that the State manipulated the instruction's "reasonable probability" language to its advantage in closing argument. The Court of Appeals dissent characterized the prosecutor's closing argument as turning the question of *probability* into one of *foreseeability*:

" 'Was it a reasonable probability that that could happen? . . . [R]ead the warning labels that are clearly displayed on that car seat. It is specific about the danger of strangulation. It is reasonably foreseeable[;] you could believe if they put a warning label on the seat that it could happen. Clearly, somebody foresaw that it could happen.' " *Cummings*, 45 Kan. App. 2d at 29 (Leben, J., dissenting).

Consequently, we are firmly convinced that the jury applied an incorrect legal standard to assess Cummings' criminal culpability, as opposed to her potential civil liability. Further, we are firmly convinced that if the jury had been properly instructed, it would have reached a different result.

Obviously, death by strangulation posed the gravest of threatened harm. Moreover, the severity of threatened harm was conveyed by the car seat's warning label. Likewise, one could argue that the daycare regulation providing that a child under 18 months old is to be placed in either a crib or playpen for naps is a regulatory body's independent assessment that placing a child in any other place to sleep is inherently perilous. See K.A.R. 28-4-116(b)(2)(A). But the State's case was particularly weak in establishing the likelihood that harm would occur. As the Court of Appeals dissent pointed out, the jury would have been justified in concluding that there was only a small chance that harm to K.H. would result from placing her in the car seat to nap. 45 Kan. App. 2d at 30 (Leben, J., dissenting). We agree. The State did not present evidence proving more than a faint or remote possibility of harm. *Cf. Chavez*, 146 N.M. at 446. As the *Chavez* court pointed out, the State can

meet its burden by presenting testimony from a medical doctor or health care professional explaining the increased risk under these circumstances or by referring to medical treatises or statistics on the risk of death from certain infant sleeping arrangements.

On the other hand, Cummings testified that she thought the car seat was a safe place for a child to sleep; she explained that she had placed other children, including her own daughter, in the car seat with no consequences. The testimony of both the forensic pathologist and the detective corroborated the notion that the likelihood of harm was small. The forensic pathologist testified that deaths of this nature were uncommon and that in 12 years in forensics she had never personally dealt with a car seat strangulation case. She also testified that she placed K.H. in the car seat to see if car seat strangulation was even possible. Similarly, the homicide detective testified that she had never before investigated a death that resulted while a child was in a car seat.

Without evidence establishing the increased level of risk, it is difficult to imagine that the State would have even prosecuted Cummings under identical circumstances in the absence of K.H.'s death, *i.e.*, the influence of hindsight bias was enormous. Therefore, we conclude that the State's failure to establish the increased level of risk led to a jury conviction based "primarily [upon] speculation and surmise." *Chavez*, 146 N.M. at 447.

Having no confidence in the jury's verdict, we reverse and remand for a new trial at which the district court will clarify its instruction regarding the legal standard the jury must apply in determining if the State has met its burden of proof to convict Cummings of the criminal offense of endangering a child.

Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and remanded with directions.