NOT DESIGNATED FOR PUBLICATION

No. 114,405

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSE MANUEL MARTINEZ-TORRES, a/k/a
JOSE M. MARTINEZ,
*Appellant*.

MEMORANDUM OPINION

Appeal from Ford District Court; VAN Z. HAMPTON, judge. Opinion filed December 23, 2016. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Alexander C. Melin*, assistant county attorney, *Natalie Randall*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., GREEN, J., and WILLIAM S. WOOLLEY, District Judge, assigned.

*Per Curiam*:  Jose Manuel Martinez-Torres (Martinez) challenges the sufficiency of the evidence to convict him of endangering a child after Martinez broke the driver's side window of a Chevy Suburban with his fist while his common-law wife was backing it out of a parking space and while his son was in the front passenger seat. Martinez' wife had a protection from abuse (PFA) order against him at the time and she had been given possession of the Suburban in the PFA order.

1

In addition, Martinez challenges the sufficiency of the evidence to convict him of stalking after being served with a protective order, that is, by recklessly damaging the targeted person's property. Martinez contends that he was the sole owner of the Suburban and that it was not his wife's property. Therefore, he contends that he cannot be convicted of criminally damaging the Suburban under the stalking statute. With this, Martinez raises an issue of statutory interpretation of the criminal stalking statute.

In looking at the evidence in the light most favorable to the State, a reasonable factfinder could find Martinez guilty beyond a reasonable doubt of endangering a child. In addition, under the stalking statute Martinez' wife had a sufficient possessory interest in the Suburban, so that a reasonable factfinder could find Martinez guilty beyond a reasonable doubt of stalking after being served with a protective order. Thus, we affirm.

FACTS

The incidents in this case took place on October 6, 2013, between Martinez and his common-law wife, M.H.C., after M.H.C. had obtained a temporary PFA order against Martinez.

On September 20, 2013, M.H.C. obtained the temporary PFA order against Martinez. The order prohibited all contact between the two and gave M.H.C. exclusive possession of their residence and business. The order granted her sole legal custody of their two children and ordered that Martinez have no parenting time. Finally, the order stated: "[M.H.C.] can continue to drive the 2001 Chevy Suburban." M.H.C. testified the Suburban was owned by Martinez and only his name appeared on the title. M.H.C. was awarded the Suburban in the subsequent divorce.

On October 1, 2013, the district court extended the temporary PFA order with modifications that allowed Martinez to have parenting time with their children as

2

provided in a schedule that included every other Sunday from 10 a.m. to 6 p.m. The modified order allowed contact between the couple "but only through text messaging and when the subject is the parties' children." All child visitation exchanges were to occur at the Dodge City Police Department. The parties did not follow this procedure on October 6, 2013, the day of the incident.

On Sunday, October 6, 2013, the children were with Martinez. On that day, Martinez' father was admitted to the hospital after an apparent heart attack, so Martinez went to the hospital with the children. When M.H.C. learned that the children were at the hospital, she went to the hospital, arriving shortly after 5 p.m., 1 hour earlier than the usual 6 p.m. transfer time, and not at the Dodge City Police Department. At the hospital, M.H.C. started to take the two children from the hospital waiting room.

Martinez testified that M.H.C. told him she had dismissed the protective order. When he asked for proof, Martinez said M.H.C. told him it was in the 2001 Chevy Suburban in the hospital parking lot. When she started to leave with the children, M.H.C. testified that Martinez grabbed her by the shoulder to try to stop her from leaving the hospital. Martinez testified that he followed her to the parking lot.

Martinez testified that he realized that M.H.C. was lying about dismissing the PFA order, so he started to leave the hospital parking lot. He said, however, he returned to the Suburban to return a bag belonging to their daughter. M.H.C. was in the driver's seat; their 14-year-old son, J.M.T., was in the front passenger seat and their daughter was in the back seat.

The two began to argue. M.H.C. started to back the Suburban out of the parking space. According to Martinez, M.H.C. rolled up her window, trapping his arm, and he punched the driver's window to free his trapped arm. J.M.T. testified that Martinez "came at" the Suburban and broke the window. Both M.H.C. and J.M.T. testified that Martinez

3

hit the window, causing it to crack. Martinez hit the window a second time, breaking it and causing broken glass to be spread over M.H.C.

M.H.C. testified she stopped reversing the Suburban, went forward into the parking spot, parked the car and went inside to the hospital where she called the police. M.H.C. and J.M.T. each sustained injuries because of the broken glass, injuries that were captured in police photographs and admitted into evidence at the jury trial. J.M.T.'s actual injuries were to his hand when he reached over to help his mother. J.M.T. testified that it was his mom's Suburban they were in when the incident took place.

As a result of this incident, Martinez was charged with aggravated endangering a child pursuant to K.S.A. 2015 Supp. 21-5601(b)(1), a severity level 9 person felony; stalking after being served a protection order pursuant to K.S.A. 2015 Supp. 21-5427(a)(3), a severity level 9 person felony; domestic battery causing bodily harm pursuant to K.S.A. 2015 Supp. 21-5414(a)(1), a Class B person misdemeanor; and criminal damage to property pursuant to K.S.A. 2015 Supp. 21-5813(a)(1), a class B misdemeanor.

The jury convicted Martinez on the stalking and domestic battery charges. Martinez was acquitted of aggravated endangering a child but was convicted of the lesser included crime of endangering a child, pursuant to K.S.A. 21-5601(a), a class A misdemeanor. Martinez was acquitted on the charge of criminal damage to property.

Martinez filed a timely notice of appeal, challenging only the child endangerment and stalking convictions.

4

*Standard of review*

When a criminal defendant challenges the sufficiency of evidence on appeal, we review all of the evidence in the light most favorable to the prosecution. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). Appellate courts do not reweigh the evidence, resolve evidentiary conflicts or make witness credibility determinations. A conviction will be affirmed if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. 303 Kan. at 789.

*Sufficiency of the evidence—endangering a child*

Martinez contends that there was insufficient evidence to convict him of the crime of endangering a child.

Martinez was charged with aggravated endangering a child, a severity level 9 person felony, but he was convicted of the lesser offense of endangering a child, a class A misdemeanor, under K.S.A. 2015 Supp. 21-5601(a), (c)(1). The instruction for the lesser offense, endangering a child, was modeled after PIK Crim. 4th 56.010 which instructed that for child endangerment, the State had to prove beyond a reasonable doubt that Martinez "knowingly and unreasonably caused or permitted [J.M.T.] to be placed in a situation in which there was a reasonable probability that [J.M.T.'s] life, body, or health would be endangered."

The Kansas Supreme Court has directed that trial courts must define the term "reasonable probability" in the instructions to the jury. *State v. Cummings*, 297 Kan. 716, 731, 305 P.3d 556 (2013). Accordingly, the district court gave the jury the clarifying language from *Cummings*, which is now included in PIK Crim. 4th 56.010. The instruction reads as follows:

"In determining if there was a reasonable probability that [J.M.T.'s] life, body, or health would be injured or endangered, you should consider along with other relevant factors: One: The gravity of the threatened harm; and Two: The likelihood that harm to [J.M.T.] would result or that he would be placed in imminent peril. Likelihood means more than a faint or remote possibility."

We note, as a preliminary matter, that the criminalization of child endangerment in K.S.A. 2015 Supp. 21-5601 is intended to prevent harm to children; accordingly, the State is not required to prove that a child actually suffered harm or was in danger in order to support a conviction under that statute. See *Cummings*, 297 Kan. at 722-23. The misdemeanor statute at issue in *Cummings* required only that the child be unreasonably placed in a situation in which the child *may be* injured or endangered. 297 Kan. at 722; see K.S.A. 2015 Supp. 21-5601(a).

Child endangerment prosecutions are extremely fact sensitive. See *State v. Sharp*, 28 Kan. App. 2d 128, 130, 13 P.3d 29 (2000) (examining the prior statute where "reasonable probability" was not an explicit element but caselaw interpreted the statute using that as the standard).

Martinez contends that the gravity of the threatened harm to J.M.T. was low; that there was only a faint or remote possibility that his actions would harm J.M.T. or place him in imminent peril; or, alternatively, that he did not knowingly place J.M.T. in imminent peril.

*(1) The gravity of the potential harm*

We first consider the gravity of the potential harm. This first *Cummings* factor focuses on the potential nature and severity of the harm if it were to happen. This inquiry is distinct from a separate inquiry on the likelihood that such harm would actually occur.

6

*State v. Laird*, No. 110,756, 2014 WL 6676136, at *5 (Kan. App. 2014) (unpublished opinion). The actual harm to J.M.T. was a small cut on one hand, a minor injury.

Martinez focuses his argument on the fact that the smashed window was made of safety glass and the fact that J.M.T. was seated in the front passenger seat on the other side of the Suburban. In closing arguments, Martinez' counsel argued to the jury that "[t]hey call it safety glass for a reason," implying that it is designed to minimize the possibility and gravity of injury when it breaks. Additionally, Martinez argues that the severity of potential injury is reduced when a person is sitting some distance away from the source of the flying glass.

The jury reviewed the photographs of where the broken glass landed after Martinez broke the window with his fist. Officer Anthony Rich, a responding officer, testified that while "some" glass reached the front passenger side of the Suburban, the amount was "not nearly as much" as on the driver's side. J.M.T. testified that the cut to his hand occurred only when he reached over to the driver's side to help his mother, not from glass on the passenger side.

Finally, Martinez argues that the actual harm, J.M.T.'s cut on his hand, was minor. He contends this demonstrates that the gravity of the potential harm was low.

Martinez contends each of these factors does not support a finding that there was a reasonable probability that he endangered J.M.T. by breaking the driver's side window.

It is important to note that *Cummings* does not hold that the potential harm must be grave for a defendant to be found guilty of endangering a child. "Grave harm" is not an element of endangering a child. See K.S.A. 2015 Supp. 21-5601(a). The gravity of the potential harm is only a factor the jury considers to determine the reasonable probability that J.M.T. would be endangered by Martinez' actions.

7

The jury had the opportunity to consider all the evidence concerning the broken glass and where it might have ended. However, broken glass is not the only factor in reviewing the gravity of the potential harm.

Martinez struck the window twice, with his children in the car, while it was moving in reverse. He struck the window once while the vehicle was moving in reverse, causing a crack in the window. Then, Martinez struck the window again, causing it to shatter.

Fortunately, M.H.C. was able to stop the vehicle in spite of Martinez' actions at her window. But Martinez cannot escape the evidence that the Suburban was moving and moving in reverse gear. A jury could conclude this evidence increases the gravity of the potential harm to all the passengers. The gravity of the potential harm would increase to both passengers if she had been incapacitated and had been unable to stop the vehicle. Alternatively, the gravity of the potential harm would have been worse if M.H.C. had stepped on the gas pedal while in reverse, either out of mistaken surprise or due to incapacity.

In reviewing the evidence in the light most favorable to the prosecution, there was sufficient evidence for a rational factfinder to determine, beyond a reasonable doubt, that the gravity of the threatened harm was enough to support a finding that there was a reasonable probability that J.M.T. would be endangered.

*(2) The likelihood of harm to J.M.T.*

Martinez argues there was insufficient evidence to prove the likelihood of harm to J.M.T. The second part of the reasonable probability instruction directed the jury to consider "[t]he likelihood that harm to [J.M.T.] would result or that he would be placed in imminent peril. Likelihood means more than a faint or remote possibility."

8

Martinez acknowledges that J.M.T. received a cut on his finger but contends that the actual harm, on its own, does not prove a likelihood of harm sufficient to determine that there was a reasonable probability that J.M.T. would be endangered. Essentially, Martinez argues that actual harm can occur even where the likelihood that it would occur is faint or remote and that the jury cannot be allowed to reason backward from the actual occurrence of harm to find a significant likelihood of harm to J.M.T.

Conversely, the State argues that the fact that J.M.T. was actually injured demonstrates that the possibility of endangerment was not fanciful or impossible. The State's use of the word "impossible" is not consistent with the controlling standard of "more than a faint or remote possibility" prescribed in *Cummings*. 297 Kan. at 731. If the standard was the "impossibility" of injury, this *Cummings* factor would be satisfied in every case where injury actually occurred, regardless of whether the likelihood was high or remote. This analysis would make this *Cummings* factor unnecessary.

Ultimately, the practical result of Martinez' argument would be that the jury should not be allowed to hear evidence of and arguments on actual injury because this evidence could be improperly used to weigh how faint or remote the possibility was of J.M.T.'s endangerment. The same logic could be applied to the jury's consideration of the gravity of the potential harm. We are not convinced that a jury would improperly use this evidence. While we agree the standard is not the "impossibility" of injury as suggested by the State, the fact of injury allows the jury to consider how remote or imminent the possibility was of J.M.T.'s endangerment. The jury can and should be allowed to consider the injury and determine whether the actual injury was a "once in a lifetime' injury, a "likely to happen every time" injury, or somewhere in between.

We note that in this case, however, the jury was allowed to hear the evidence and arguments on the fact of actual injury, because Martinez was charged with and the jury instructed on aggravated endangering a child. A "faint or remote" possibility is not a

9

consideration for determining if J.M.T. *was* endangered. See PIK Crim. 4th 56.020 (Aggravated Endangering A Child).

Additionally, Martinez argues we should apply our court's decision in *State v. Hernandez*, 40 Kan. App. 2d 525, 193 P.3d 915 (2008) to the facts of this case. In *Hernandez*, the defendant was charged with recklessly endangering a child. She had left her 2-year-old son in the front yard to play with older children while she was inside cooking dinner. She looked away for a moment and all the children were gone. The children had left to go play at a nearby Dillons parking lot and its adjoining retaining water pool. Hernandez was charged with aggravated endangering a child, which required proof that her child *was* endangered. At the preliminary hearing, the district court dismissed the charge, finding this was nothing more than an accident and there was no reckless conduct on the part of Hernandez. 40 Kan. App 2d at 526.

In addition, Martinez cites to *Laird* as persuasive authority on the issue of likelihood of harm. In *Laird*, the defendant was left in charge of his 4-year-old daughter while his wife went out for the evening. The mother returned to find that Laird was not there, the door was unlocked and the daughter was home alone sleeping in her bed. Laird was charged with endangering a child. The only evidence presented regarding the length of his absence indicates he was gone for about 5 minutes; thus, the window of time for potential harm was small. See *Laird*, 2014 WL 6676136, at *7. We found there was insufficient evidence to support the defendant's conviction for endangering a child because the risk of serious harm to the child was nothing "other than a faint or remote possibility" when the defendant left her sleeping in her bed while he left the house. *Laird*, 2014 WL 6676136, at *7.

Conversely, as we noted in *Laird*, we have upheld endangerment convictions where the risk of harm is imminent or foreseeable. See *State v. Ramos-Beleta*, No. 105,941, 2012 WL 5519119, at *7 (Kan. App. 2012) (unpublished opinion) (court upheld

conviction for endangering a child based on evidence that the ex-husband broke into the ex-wife's house and attacked her by stabbing her in the leg with a knife and cutting her hand with a screwdriver in front of their children after the mother called them in to help her).

In *Hernandez* and *Laird*, the defendants' charges were based upon their alleged lack of properly supervising their children. There were no violent acts directed at or near the children. Whereas, in *Ramos-Beleta*, the defendant's charges were based upon alleged violent acts directed at his ex-wife with their children in close proximity.

Martinez' actions in this case were not those of inattentive supervision. As the defendant did in *Ramos-Beleta*, Martinez violently directed his frustration against M.H.C. with his children in close proximity. He punched the window next to M.H.C. while the car was moving, in reverse gear, not once, but two times, with sufficient force to ultimately shatter the glass, with her children in close proximity.

In reviewing the evidence in the light most favorable to the prosecution, there was sufficient evidence for a rational factfinder to determine, beyond a reasonable doubt, that the likelihood of the harm or imminent peril was enough to support a finding that there was a reasonable probability that J.M.T. would be endangered.

*(3) Knowingly*

Martinez briefly contends that the evidence fails to demonstrate Martinez knew of any danger posed to J.M.T. by his actions. As stated in the jury instruction, the State had to prove Martinez "knowingly and unreasonably caused or permitted [J.M.T.] to be placed in a situation in which there was a reasonable probability that [J.M.T.'s] life, body, or health would be endangered."

11

A defendant acts knowingly when he "is aware that [his] conduct is reasonably certain to cause the result" complained about by the State. K.S.A. 2015 Supp. 21-5202(i). As we noted above, the criminalization of child endangerment in K.S.A. 2015 Supp. 21-5601 is intended to prevent harm to children; accordingly, the State is not required to prove that a child actually suffered harm in order to support a conviction under that statute. See *Cummings*, 297 Kan. at 722-23. The statute at issue in *Cummings* required only that the child be unreasonably placed in a situation in which the child *may be* injured or endangered. 297 Kan. at 722.

Therefore, the "result" complained about by the State, *i.e.*, the result this statute is trying to prevent, is a person acting in such a way a child may be endangered. Thus, the State would have to prove that Martinez was aware his conduct was reasonably certain to place J.M.T. in a situation where J.M.T. *may be* endangered. Martinez did not have to know he was endangering J.M.T., he only had to know his actions may be endangering J.M.T.

As we stated above, Martinez took violent actions against M.H.C.'s window. As he repeatedly hit the window, a jury could conclude Martinez knew his actions were reasonably certain to break the window. Once the window was cracked with the first hit, Martinez was put on notice that further strikes may cause the window to break and potentially shower broken glass on the people in the vehicle. As with the defendant in *Ramos-Beleta*, Martinez' repeated strikes against the window were intentional and not the result of negligent supervision. With this in mind, a jury could conclude Martinez knew his actions were reasonably certain to place J.M.T. in a situation where J.M.T. may be endangered.

In reviewing this evidence in the light most favorable to the prosecution, there was sufficient evidence for a rational factfinder to have found beyond a reasonable doubt that Martinez acted knowingly.

12

In conclusion, in reviewing the evidence in the light most favorable to the prosecution, there was sufficient evidence for a rational factfinder to have found beyond a reasonable doubt that Martinez was guilty of endangering a child.

*Sufficiency of the evidence—stalking after being served a protective order*

Martinez was convicted of stalking after being served with a PFA order, pursuant to K.S.A. 2015 Supp. 21-5427(a)(3), for breaking the window of the Chevy Suburban. K.S.A. 2015 Supp. 21-5427(a)(3) provides:

> "(a) Stalking is:
>
> . . . .
>
> "(3) after being served with, or otherwise provided notice of, any protective order included in K.S.A. 21-3843, prior to its repeal or K.S.A. 2015 Supp. 21-5924, and amendments thereto, that prohibits contact with a targeted person, recklessly engaging in at least one act listed in subsection (f)(1) that violates the provisions of the order and would cause a reasonable person to fear for such person's safety, or the safety of a member of such person's immediate family and the targeted person is actually placed in such fear."

Martinez does not dispute that he was served with the PFA order.

To be found guilty, the jury must find that Martinez engaged in at least one of the acts listed in K.S.A. 2015 Supp. 21-5427(f)(1). In this case, the complaint alleged a violation of K.S.A. 2015 Supp. 21-5427(f)(1)(D), which reads: "A course of conduct shall include, but not be limited to, any of the following acts or a combination thereof: . . . (D) causing damage to the targeted person's residence or *property* or that of a member of such person's immediate family." (Emphasis added.)

13

The court gave the jury the following verdict form on the stalking charge: "We, the jury, find the defendant guilty of stalking after being served with or given notice of a protective order, and . . . Recklessly causing damage to [M.H.C.'s] vehicle." Both parties agreed on the language of the verdict form.

Martinez' name was listed as the sole owner on the title and registration of the Suburban. As such, he contends, and his attorney argued to the jury, that the Suburban was not M.H.C.'s property for purposes of the stalking statute. As a result, Martinez contends there is insufficient evidence for him to be found guilty of damaging a targeted person's property.

The issue is one of statutory interpretation. Statutory interpretation is a question of law to be reviewed de novo. *State v. Williams*, 298 Kan. 1075, 1079, 319 P.3d 528 (2014). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State v. Jordan*, 303 Kan. 1017, 1019, 370 P.3d 417 (2016). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016).

When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language and it should refrain from reading something into the statute that is not readily found in its words. *Barlow*, 303 Kan. at 813. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the legislature's intent. 303 Kan. at 813. We first examine the meanings of the words of the statute and then evaluate whether there is an ambiguity and how it should be resolved.

The stalking statute is silent as to what interest the targeted person must have in the damaged property—a proprietary or a possessory interest. Martinez argues that there

14

is an ambiguity in the statute on this question, and asks that the rule of lenity be applied to interpret the statute in his favor, *i.e.*, as requiring ownership, citing *State v. Reese*, 300 Kan. 650, 653, 333 P.3d 149 (2014). Before the rule of lenity may be applied, there must be a reasonable doubt as to a criminal statute's meaning. *State v. Coman*, 294 Kan. 84, 97, 273 P.3d 701 (2012). In *Coman*, the Kansas Supreme Court discussed the rule of lenity extensively:

> "As a general rule, criminal statutes must be strictly construed in favor of the defendant. *State v. Paul*, 285 Kan. 658, 662, 175 P.3d 840 (2008). Any reasonable doubt as to the meaning of the statute is decided in favor of the accused, subject to the rule that judicial interpretation must be reasonable and sensible to effect legislative design and intent. *State v. Jackson*, 291 Kan. 34, 40, 238 P.3d 246 (2010). See also *State v. Bonner*, 290 Kan. 290, 296, 227 P.3d 1 (2010) (stating that strict construction 'simply means that the court reads words with their ordinary meaning,' and then decides any reasonable doubt in favor of the accused)." *Coman*, 294 Kan. at 96.

Martinez focuses his argument on the statute's phrasing "targeted person's . . . property" and notes correctly that the noun is in a possessive form with "property" as the object of possession. We agree that the word "possess" is not present in the statute. With this in mind, he argues that this creates an ambiguity in the statute. Martinez argues that because of this ambiguity, the rule of lenity must be applied.

The State argues that the focus should instead be on the word actually used in the statute, "property," and asks us to hold that a possessory interest in the sense of control or dominion, or any level of proprietary interest, is "property" for purposes of the statute. If so, the State argues this is sufficient to invoke the protections of the statute. In support, the State cites the legal definition of property and a Kansas Supreme Court case holding that "an interest" in property need not be an ownership interest.

Black's Law Dictionary defines *property* as:

15

"1. Collectively, the rights in a valued resource such as land, chattel, or an intangible. It is common to describe property as a 'bundle of rights.' These rights include the right to possess and use, the right to exclude, and the right to transfer.—Also termed *bundle of rights*. 2. Any external thing over which the rights of possession, use, and enjoyment are exercised <the airport is city property>." Black's Law Dictionary 1410 (10th ed. 2014).

We consider this definition as it may be applied to what M.H.C. was granted in the PFA order.

The PFA statute states what a court may place in a PFA order. K.S.A. 2015 Supp. 60-3107. One of the permissible orders is "[m]aking provision for the *possession* of personal property of the parties and ordering a law enforcement officer to assist in securing possession of that property, if necessary." (Emphasis added.) K.S.A. 2015 Supp. 60-3107(a)(8).

On page 2 of the September 20, 2013, temporary order of protection from abuse, the court ordered: "[Martinez] shall not abuse, molest, or interfere with the privacy or *rights* of the protected person(s) wherever they may be." (Emphasis added.) In this same order, on page 3, M.H.C. was given the right to continue to drive the Suburban. Thus, Martinez was put on notice that he could not take any action to interfere with M.H.C.'s rights, including her right to drive the Suburban.

The effect of the PFA order was to continue M.H.C.'s interest in the Suburban while limiting Martinez' interest. This order allowed her to exercise the rights of possession, use, and enjoyment of the Suburban. The order also gave her the right to exclude Martinez from the use and enjoyment of the Suburban. Although Martinez retained legal ownership of the vehicle, the PFA order temporarily deprived him of the right to the use, possession, and enjoyment of the Suburban. This order would also prevent him from selling the Suburban, as a sale would interfere with her rights to the

16

Suburban. Finally and importantly, the PFA statute demonstrates that the property interest given by a PFA order to be so important the statute allows the court to direct law enforcement to assist the targeted party in securing possession of the property. See K.S.A. 2015 Supp. 60-3107(a)(8). In effect, the Suburban was Martinez' property in registration name only.

As such, M.H.C. had all the rights in the Suburban, other than the right to transfer the Suburban that are listed in the Black's Law Dictionary definition of property. Her rights were superior to Martinez' in almost every respect. With this in mind, there is no ambiguity requiring the court to apply the rule of lenity. From these definitions alone, we conclude that property interest granted to M.H.C. in the Suburban was "property" for purposes of the stalking statute.

*"Property Interest" in the arson and the criminal damage statutes*

Both parties cite the arson and the criminal damage to property statutes that criminalize damage to property in which another person *has an interest,* without the consent of such other person. See K.S.A. 2015 Supp. 21-5812(a)(1)(A); K.S.A. 2015 Supp. 21-5813(a)(1).

Recently, the Kansas Supreme Court reviewed the type of interest that was necessary to be convicted of arson in *State v. Bollinger*, 302 Kan. 309, 316, 352 P.3d 1003 (2015), *cert. denied* 136 S. Ct. 858 (2016). The arson statute criminalizes fire or explosive damage against dwellings or property "in which another person has any interest." See K.SA. 2015 Supp. 21-5812(a). In *Bollinge*r, the wife had a court order granting her temporary exclusive possession of the marital residence after she filed for divorce. The husband was accused of the arson to their marital residence. The court held that the wife had a "sufficient, cognizable legal interest . . . to satisfy the statutory

17

requirement" of a property interest in the couple's home derived from the court order and "from the legal rights inherent in a marital relationship." 302 Kan. at 315, 17.

Regarding the criminal damage to property statute, the State cites *State v. Fisher,* 304 Kan. 242, 373 P.3d 781 (2016), published after Martinez' brief was filed. In *Fisher*, the Kansas Supreme Court considered the nature of the interest required under the criminal damage to property statute which prohibits "knowingly damaging . . . any property in which another has any interest without consent of such other person." K.S.A. 2015 Supp. 21-5813(a)(1). Fisher set fire to his home which had other residents. The court held that merely living in the home where damage occurred was a sufficient interest in the property under the criminal damage to property statute, even without evidence of ownership. 304 Kan. at 262.

While the language in the stalking statute uses only the word "property," but the arson and criminal damage to property statute uses property with the additional qualifying language "in which another has an interest," the principle is the same. For purposes of the arson statute, the court in *Bollinger* recognized that the legal ownership interest of the husband was not superior to the wife's legal rights inherent in the marital relationship and given to her in the temporary order. See *Bollinger*, 302 Kan. at 315. For purposes of the criminal damage to property statute, the court in *Fisher* recognized the legal rights of the owner were not superior to the rights of one of the residents of the house. See *Fishe*r, 304 Kan. at 262. In this case, Martinez' rights to the vehicle were in name only. At the time of the incident, M.H.C.'s rights to the Suburban were superior in every other respect.

*The interpretation invokes policy considerations*

Courts presume the legislature does not intend to enact useless or meaningless legislation. *State v. Frierson*, 298 Kan. 1005, 1013, 319 P.3d 515 (2014). While criminal

18

statutes are to be construed in favor of the defendant, that rule is constrained by the rule that the interpretation of a statute must be reasonable and sensible to effect the legislative design and intent of the law. *Barlow*, 303 Kan. at 813. "Equally fundamental is the rule of statutory interpretation that courts are to avoid interpretations that yield absurd or unreasonable results." *Frierson*, 298 Kan. at 1013.

The State argues that reading the statute to require that a targeted person must have more ownership rights than rights of use, possession, enjoyment, and to prevent transfer of the property would leave some targeted persons at risk. Martinez' definition of "property" under the statute would render the statute potentially meaningless as applied to married parties and meaningful only between unmarried parties. If the PFA order gave M.H.C. a less than complete interest in the property, the Suburban, but Martinez could damage the property because of his legal ownership in the property, that section would become meaningless when the PFA order was between married couples and meaningful only between unmarried parties. One spouse could recklessly damage personal property such as puncturing tires, breaking windows, contaminating the gasoline, and any other possible means that would interfere with the other spouse's temporary possessory property interest.

Martinez' theory would "absurdly narrow" the reach of the statute and grant a "free pass" for a stalker to place the targeted person in fear, so long as the property he or she damages is owned by someone other than the targeted person. See *Frierson*, 298 Kan. at 1014 (explaining how defendant's proposed interpretation of the burglary statute would absurdly narrow the reach of the statute and grant a free pass to defendants who remained within a structure, causing absurd results). In addition, with these limitations on Martinez' interest in the Suburban, it is problematic if he could legally recklessly damage marital property because of the legal title of the property.

The jury heard the evidence that the couple purchased the vehicle earlier in the marriage. They heard the testimony that only Martinez' name was on the title and registration. The jury heard the evidence that both Martinez and M.H.C. made the payments on the car loan. They heard the evidence that M.H.C. drove the vehicle. They heard J.M.T.'s testimony that the Suburban was her vehicle. They reviewed the PFA order. The jury heard Martinez' attorney's arguments on why the Suburban was not M.H.C.'s property.

In reviewing this evidence in the light most favorable to the prosecution, there was sufficient evidence for a rational factfinder to have found beyond a reasonable doubt that Martinez was guilty of stalking after being served a protective order.

Affirmed.