*Beverly Annetta Hall v. State of Maryland*, No. 50, September Term, 2015. Opinion by Battaglia, J.

**CRIMINAL LAW – CHILD NEGLECT STATUTE – SUFFICIENCY OF THE EVIDENCE –** The evidence presented in the circuit court, even when viewed in a light most favorable to the State, was not sufficient to support Petitioner's conviction under the criminal child neglect statute. Section 3-602.1 of the Criminal Law Article requires that the parent's conduct be such that it creates a substantial risk of harm to the physical health of the child and that a reasonable parent would not engage in such conduct.

Circuit Court for Montgomery County,
Maryland
Criminal Case No. 122148
Argued: January 11, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 50

September Term, 2015

_____

BEVERLY ANNETTA HALL

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
*Battaglia,
Greene,
Adkins,
McDonald,
Watts,
Hotten,

JJ.

_____

Opinion by Battaglia, J.
Barbera, C.J. and McDonald, J., concur
Greene, Watts, and Hotten, JJ., dissent

_____

Filed:  June 23, 2016

*Battaglia, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

This case concerns Maryland's criminal child neglect statute, Section 3-602.1 of the Criminal Law Article, Maryland Code (2012 Repl. Vol.), which defines "neglect" as "the intentional failure to provide necessary assistance and resources for the physical needs or mental health of a minor that creates a substantial risk of harm to the minor's physical health or a substantial risk of mental injury to the minor."[1] The statute carries a penalty of "imprisonment not exceeding 5 years or a fine not exceeding $5,000 or both." Maryland Code (2012 Repl. Vol.), Section 3-602.1(c) of the Criminal Law Article.

---

[1] Section 3-602.1 of the Criminal Law Article provides:

    (a)(1) In this section the following words have the meanings indicated.
      (2) "Family member" has the meaning stated in § 3-601 of this subtitle.
      (3) "Household member" has the meaning stated in § 3-601 of this subtitle.
      (4) "Mental injury" means the substantial impairment of a minor's mental or psychological ability to function.
      (5)(i) "Neglect" means the intentional failure to provide necessary assistance and resources for the physical needs or mental health of a minor that creates a substantial risk of harm to the minor's physical health or a substantial risk of mental injury to the minor.
        (ii) "Neglect" does not include the failure to provide necessary assistance and resources for the physical needs or mental health of a minor when the failure is due solely to a lack of financial resources or homelessness.

    (b) A parent, family member, household member, or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not neglect the minor.

    (c) A person who violates this section is guilty of the misdemeanor of child neglect and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $5,000 or both.

    (d) A sentence imposed under this section shall be in addition to any other sentence imposed for a conviction arising from the same facts and circumstances unless the evidence required to prove each crime is substantially identical.

Beverly Annetta Hall, the Petitioner, had been convicted by a jury in the Circuit Court for Montgomery County of neglect of her minor son and was sentenced to twenty days' incarceration. Ms. Hall appealed the judgment of the Circuit Court to the Court of Special Appeals, arguing that the definition of "neglect" contained in Section 3-602.1(a)(5)(i) of the Criminal Law Article was unconstitutionally vague and that the evidence was insufficient to support her conviction. The Court of Special Appeals affirmed the judgment of the Circuit Court, and we granted certiorari to address the following questions:

> 1. As an issue of first impression, is Md. Code Ann., Crim. Law § 3-602.1, the criminal neglect of a minor statute, unconstitutional because it is vague?
>
> 2. Was the evidence sufficient to support conviction for neglect of a minor?

*Hall v. State*, 444 Md. 638, 120 A.3d 766 (2015). For the reasons that follow, we assume, without having to decide, that the criminal neglect of a minor statute is constitutional but reverse the judgment of the Court of Special of Appeals, because we hold that the evidence was insufficient to support Hall's conviction for criminal child neglect.

Early in 2013, Beverly Hall was charged by criminal information in the Circuit Court for Montgomery County with one count of neglect of her minor son A.,[2] in violation of Section 3-602.1 of the Criminal Law Article,[3] ostensibly for having, over a

---

[2] We shall refer to Hall's minor children by their first initials only.

[3] Section 3-602.1 of the Criminal Law Article provides, in relevant part:
(a)(1) In this section the following words have the meanings indicated.
* * *
(5)(i) "Neglect" means the intentional failure to provide necessary assistance and resources for the physical needs or mental health of a minor

2

two day period, beginning on February 24 and ending on February 26, 2012, left A. under the supervision of his fourteen-year-old sister, D. Ms. Hall filed a motion to dismiss the charge, arguing, among other things, that Section 3-602.1 was unconstitutionally vague, because the statute "fail[ed] to inform the ordinary person what conduct is prohibited by its enactment[,]" and "fail[ed] to delineate at which point personal parenting choices escalate to neglect, [leading] to arbitrary and discriminatory enforcement." The motion was denied orally by the circuit court judge who remonstrated that Section 3-602.1 of the Criminal Law Article contained an "awful broad definition of neglect," but determined that it was not vague:

> I understand the argument, and I understand what the defense is saying here and I guess the bottom line is you may win this argument upstairs. I don't know, but I'm not going to – I just don't find it to be void for vagueness… I'm not going to find that the statute is void for vagueness. You know, that's something the Court of Special Appeals is going to have to do.

The evidence subsequently adduced at trial, taken in the light most favorable to the State,[4] reflected that in the Fall of 2011, Ms. Hall, her fiancé, and three children—two daughters, thirteen-year-old D. and ten-year-old M., and a son, three-year-old A.—were

---

> that creates a substantial risk of harm to the minor's physical health or a substantial risk of mental injury to the minor.
>
> (ii) "Neglect" does not include the failure to provide necessary assistance and resources for the physical needs or mental health of a minor when the failure is due solely to a lack of financial resources or homelessness.

[4] We have stated that, when reviewing a conviction to determine the sufficiency of the evidence, "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. State*, 415 Md. 174, 184, 999 A.2d 986, 991 (2010), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)

3

living in a single family home on Lima Drive in Silver Spring, Maryland. Nyree Wannall, a licensed clinical social worker with Montgomery County Child Welfare, had been providing services to Ms. Hall's family since May of 2011.[5] Ms. Wannall would perform home visits with Ms. Hall and her family two times monthly, except during the children's summer vacation when all three visited their maternal grandmother in Florida.

Based on Ms. Wannall's observations during her home visits, three-year-old A. "ran rampant[,]" "was very, very difficult to control[,]" and was "very active." Ms. Wannall described A.'s behavior as: "[y]ou would be there during a home visit, and he would pick up something, and it wouldn't be surprising if he picked something up and threw it at his sister, or threw it at the TV, and just was always moving." During one of Ms. Wannall's home visits in September of 2011, A. threw a bottle at his sister's face, threw a bottle at the T.V., and bit Ms. Wannall's foot. He then opened the closed front door of the residence, ran outside, and entered the truck of a postal worker who was in the neighborhood, all during the time his mother was present. D., A.'s sister, retrieved A. from the mail truck, and Ms. Hall did not attempt to control or discipline A. during this episode.

During Ms. Wannall's home visits, she would meet with Ms. Hall and the children and would discuss "issues that may have come up with the individuals in the house[.]" A recurring issue raised during Ms. Wannall's discussions with Hall was that "[D.] needed to spend her time on her studies in school, needed to be a child and not have as many responsibilities in the home[,]" and "[D.] having too many responsibilities with [A.]" By

_____

[5] The reasons for Ms. Wannall's involvement with Hall's family were not disclosed.

February 15, 2012, Ms. Hall had agreed with Ms. Wannall that "[A.] was too difficult for [D.] to watch[,]" and that she "would only allow [D.] to watch [M.], her younger sister."

During the afternoon of Wednesday, February 22, 2012, D. (now fourteen years of age) and M. had finished the school day and went to A.'s babysitter to pick him up. After bringing A. home, D. was upstairs doing her homework, but came downstairs to find that the front door was open and A. was missing; Ms. Hall was not present at 4:30pm that day, Officer Jim Walsh, responding to a call at a different location, found A. without supervision, wearing only a t-shirt and a diaper, whereupon the Officer went looking for A.'s parents. D. and M. approached Officer Walsh and stated that they "didn't know [A.] got out." Officer Walsh then brought A. back to the house on Lima Drive and retrieved Hall's phone number from D. and attempted to call Ms. Hall "at least five" times. He was unable to contact her, and did not recall whether he had left any voicemail messages but left A. under the supervision of D. Ms. Wannall learned of this incident the following day, on February 23, 2012, but did not contact Ms. Hall, as she did not want to interfere with any investigation that might be triggered by Officer Walsh reporting the incident to Child Protective Services.

According to D., A.'s escape from the home on February 22nd was the third time that she had gone to the playground to retrieve him while he was under her supervision. On a previous occasion, although police had been notified, D. was able to retrieve A. before the police arrived at the playground. The police did follow-up, and came to the house on Lima Drive and instructed D. to have Ms. Hall contact them. D., however, did

5

not inform Ms. Hall of any of these occasions on which A. had escaped to the playground.

On Friday, the 24th of February, Ms. Hall and her fiancé attempted to bring the children to their godmother's home in Prince George's County, where the children would spend the weekend. Ms. Hall, however, was unable to locate the godmother and returned home.

Once home, the children unpacked their belongings, placed some food in the refrigerator, and got ready for bed by taking baths and changing into their "night clothes." Ms. Hall did not tell the children where she was going or how long she would be gone, but left an emergency cell phone with D. and told her to call if she needed anything. Ms. Hall also told D. that she would call her "when she [got] to her destination, because she [had] to charge her phone." Ms. Hall and her fiancé then left at around 10:00 or 11:00 p.m., and D. locked the door behind them.

Following Ms. Hall's departure, the children began watching a movie in the living room. While watching the movie, A., M., and ultimately D., fell asleep. D. then awoke between midnight and 1:00 a.m. to find that A. was no longer on the couch. D. searched the house for A. to no avail and noticed that the front door to the residence was open. D. attempted to call Hall three to four times, but each of the calls went straight to voicemail. D. also called the fiancé, whose phone number was programed in the emergency phone, but no one answered. D. thought she heard someone pick up on one of them but the person on the other line hung up shortly thereafter.

After failing to reach her mother, D. called the police and searched the neighborhood, while M. stayed at the house. After D. returned without having found A., she made several additional calls to the police. Two police officers, including Officer Rodney Campbell, arrived around 2:30 am and informed D. that they had found A.

Shortly after 2:00 a.m., Officer Campbell had responded to a call at the intersection of New Hampshire Avenue and Hollywood Avenue (located some 300 to 400 yards from Ms. Hall's home) and encountered a gentleman pulled over on the side of the road. The man explained to Officer Campbell that he had a baby in his car and that he had almost struck the child, who had been in the middle of the six lane roadway. The child was dressed only in sweatpants and a t-shirt. Officer Campbell, after determining the child's name was A., contacted other officers and gave out A.'s name and asked whether any of the officers "had dealt with the child before." Officer Walsh, who had come across A. earlier that week, arrived at the intersection and led Officer Campbell to A.'s home.

After the officers arrived at A.'s home, they attempted to call both Ms. Hall and her fiancé, but were unable to reach either of them. The officers then took the children, including A., to the police station where the officers again were unsuccessful in contacting Ms. Hall. As a result, the officers contacted Child Protective Services ("CPS") and Laura Erstling, the on-call social worker with the Montgomery County Department of Health and Human Services, Child Welfare Service Program, arrived at the police station around 3:30 a.m. Ms. Erstling instructed the officers to leave a note on the door of the home telling Ms. Hall how to reach her and how to get in touch with the children. Ms.

Erstling attempted around 4:00 a.m. to contact Ms. Hall, but was not successful and left a voicemail detailing who she was and how Ms. Hall could reconnect with her children.

Having had no success contacting Hall, Ms. Erstling drove the children to an emergency foster home at 7:30 a.m. Ms. Hall called Montgomery County Child Protective Services at 10:20 am on the morning of February 25, 2012 "to inquire about the whereabouts of her children."

Ms. Hall then was charged with one count of criminal child neglect in the Circuit Court for Montgomery County. After an initial trial in which the jury had failed to reach a unanimous verdict, the State retried Ms. Hall. A second jury did convict Ms. Hall, after which the Judge imposed a sentence of 20 days' incarceration. Ms. Hall then noted an appeal to the Court of Special Appeals.

On appeal, Ms. Hall contended that Section 3-602.1 of the Criminal Law Article was void for vagueness and that the evidence was insufficient to support her conviction. The Court of Special Appeals, in an unreported opinion, *Beverly Annetta Hall v. State of Maryland*, September Term, 2013, No. 2473 (April 21, 2015), affirmed.

The court determined that the statute was "not vague as applied to the facts of the instant case" because "[Hall] was fully aware that D[.] was not a proper caregiver for A[.]":

> A reasonably intelligent person would not have to speculate whether leaving a three year-old alone with an improper caregiver for any length of time, much less overnight, and without an effective way to be contacted in case of an emergency, would constitute neglect as defined in the statute. The statute is not vague as applied to the facts of the instant case.

*Id.* at 9. The Court of Special Appeals also rejected Hall's argument that she was inadequately notified of conduct that could violate the statute:

> The risk of harm to such a young child, especially one who is "very, very difficult to control," is not limited to the harm that might come from the child exiting the house and wandering outside unsupervised. There are any number of injuries that could foreseeably result from knowingly leaving an improperly supervised and rambunctious three year-old inside the home as well. [Hall] saw the child throw a dangerous object at people in the home and bite Ms. Wannall on the foot. [A.] also ran out of the house on the day Ms. Wannall was meeting with [Hall] for a home visit. Certainly [Hall] knew or should have known that [A.] could and did leave the house on his own.

*Id.* at 10-11.

Concerning sufficiency of the evidence, the intermediate appellate court observed that an appellate court must "'view[] the evidence, and all inferences fairly deducible from the evidence, in a light most favorable to the State.'" *Id.* at 18-19, quoting *Twine v. State*, 395 Md. 539, 554, 910 A.2d 1132, 1141 (2006). The Court then remonstrated that Ms. Hall was present on at least one occasion where A. ran out of the house, and Ms. Hall had agreed that D. should not be responsible for A.'s supervision. Furthermore, "despite this agreement, [Hall] intentionally left [D.] in charge of [A.] for an unspecified amount of time, including overnight hours, and did not answer calls in the middle of the night from [D.], nor did [Hall] answer calls or return messages from the police and CPS." *Id.* at 19. In light of the above, the court opined that, "there was sufficient evidence before the jury for it to find beyond a reasonable doubt that [Hall] neglected [A.] by intentionally leaving him in the care of [D.] in excess of twelve hours, without any effective means to reach her in case of an emergency." *Id.* at 20.

Ms. Hall, before us, initially raises the issue that the "neglect of a minor statute is unconstitutionally vague on its face and as applied to the particular facts of this case[.]" Because we shall hold that there was not sufficient evidence to sustain Ms. Hall's conviction under Section 3-602.1 of the Criminal Law Article, the criminal child neglect statute, we need not reach the constitutional issue.[6]

The criminal neglect statute, Section 3-602.1 of the Criminal Law Article, provides, in relevant part, that "'Neglect' means the intentional failure to provide necessary assistance and resources for the physical needs or mental health of a minor that creates a substantial risk of harm to the minor's physical health or a substantial risk of mental injury to the minor." Maryland Code (2012 Repl. Vol.), Section 3-602.1(a)(1)(5)(i) of the Criminal Law Article.[7] The intentional failure relates to that of "[a] parent, family member, household member, or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor."

Although the Court of Special Appeals correctly characterized intent only with reference to whether Ms. Hall failed to provide necessary assistance and resources for the physical health of A., throughout its opinion the court speculated as to the harm that could have befallen A. because of his having been left by Ms. Hall in the care of his fourteen-year-old sister. It is not conjecture about potential harm, however, that governs,

---

[6] "This Court has emphasized, time after time, that the Court's 'strong' and 'established policy is to decide constitutional issues only when necessary.'" *VNA Hospice of Maryland v. Dep't of Health & Mental Hygiene*, 406 Md. 584, 604, 961 A.2d 557, 569 (2008), quoting *Burch v. United Cable*, 391 Md. 687, 695–696, 895 A.2d 980, 984–985 (2006).

[7] The State and Ms. Hall agreed that the "mental health" of A. was not the issue in this case.

but rather whether the conduct at issue, evaluated objectively, created a substantial risk of harm.

"Intentional failure to provide necessary assistance and resources for the physical needs . . . of a minor <u>that</u> creates a substantial risk of harm . . ." is the pivotal statutory phrase. "[C]reates a substantial risk" in Section 3-602.1(a)(5)(i) is the same language used in our reckless endangerment statute, Section 3-204 of the Criminal Law Article, Maryland Code (2012 Repl. Vol.), which states, in relevant part:

(a) A person may not recklessly:

(1) engage in conduct that *creates a substantial risk* of death or serious physical injury to another.

The similarity between Section 3-602.1, the criminal child neglect statute, and the reckless endangerment statute, Section 3-204, was noted in testimony in 2011 against the passage of Senate Bill 178, the origin of Section 3-602.1, provided by Melissa S. Rock of Advocates for Children and Youth,[8] who suggested that the proposed child neglect statute was unnecessary because, "[w]e also have a reckless endangerment statute through which a person can be prosecuted for placing another individual at a substantial risk of death or serious physical injury." The Office of the Public Defender provided similar testimony in opposition to S.B. 178, arguing that the bill "[was] largely duplicative of existing law" by referencing, among other statutes, Section 3-204 of the Criminal Law Article, the reckless endangerment statute, which states that the crime of reckless endangerment is a

---

[8] Advocates for Children and Youth is an organization that "provide[s] advocacy and impact data as well as personalized stories to help tell the story of Maryland's children in a simple way." Advocates For Youth, www.acy.org, http://www.acy.org/about-us/who-we-are/ (https://perma.cc/4PLR-T9D5).

11

person acting "recklessly" by "engag[ing] in conduct that creates a substantial risk of death or serious physical injury to another."

We set forth the elements of a *prima facie* case of reckless endangerment in *Jones v. State*, 357 Md. 408, 427, 745 A.2d 396, 406 (2000), as:

> 1) that the defendant engaged in conduct that created a substantial risk of death or serious physical injury to another; 2) that a reasonable person would not have engaged in that conduct; and 3) that the defendant acted recklessly.

The Maryland Criminal Pattern Jury Instruction on reckless endangerment, Section 4:26A, embodies those same elements.[9] In *Williams v. State*, 100 Md. App. 468, 481, 641 A.2d 990, 996 (1994), the Court of Special Appeals recognized that the purpose of the reckless endangerment statute is to punish conduct that was potentially harmful, even when no actual harm had occurred. ("At the *actus reus*[10] level, [reckless endangerment] is one element short of consummated harm. At the *mens rea* level, it is one element short of

---

[9] Maryland Pattern Jury Instruction Section 4:26A provides:
> The defendant is charged with the crime of reckless endangerment. In order to convict the defendant of reckless endangerment, the State must prove:
> (1) that the defendant engaged in conduct that created a substantial risk of death or serious physical injury to another;
> (2) that a reasonable person would not have engaged in that conduct; and
> (3) that the defendant acted recklessly.

MPJI-Cr § 4:26A Reckless Endangerment (2013 Supp.).

[10] The Latin term used to describe a criminal act. Every crime must be considered in two parts—the physical act (*actus reus*) and the mental intent to do the crime (*mens rea*). *Garnett v. State*, 332 Md. 571, 577-78, 632 A.2d 797, 800 (1993) ("In this regard, it is well understood that generally there are two components of every crime, the *actus reus* or guilty act and the *mens rea* or the guilty mind or mental state accompanying a forbidden act.")

consummated harm. At the *mens rea* level, it is one element short of the specific intent necessary for either an attempt or for one of the aggravated assaults.").

The issue oftentimes plumbed with respect to the *actus reus* of creating a substantial risk of harm has been whether to measure a defendant's conduct by a subjective standard or an objective one in order to determine its criminality. Judge Charles Moylan, writing for the Court of Special Appeals in *Williams*, 100 Md. App. at 495, 641 A.2d at 1003, discussed the subjective-objective dichotomy:

> . . . It is undisputed that the *actus reus* of creating a substantial risk is to be measured objectively, not subjectively. The *mens rea* of the defendant, although indispensable to an ultimate finding of guilt, has nothing to do with the establishment of the *actus reus*. Whether the conduct in issue has, indeed, created a substantial risk of death or serious physical injury is an issue that will be assessed objectively on the basis of the physical evidence in the case.

Judge Moylan's words have been relied upon in other Court of Special Appeals opinions considering reckless endangerment. *See also Marlin v. State*, 192 Md. App. 134, 168, 993 A.2d 1141, 1161 (2010); *Albrecht v. State*, 105 Md. App. 45, 85, 658 A.2d 1122, 1141 (1995); *Wieland v. State*, 101 Md. App. 1, 28, 643 A.2d 446, 459 (1994).

With respect to the evaluation of a defendant's conduct and the creation of risk, the assessment must be made objectively. The reasonable person standard oftentimes is utilized to measure deviation from the norm, upon which criminal liability is based. *Eanes v. State*, 318 Md. 436, 462, 569 A.2d 604, 616 (1990) ("The objective 'reasonable' test is used in many areas of the law as an appropriate determinant of liability and thus a guide to conduct."). Essentially, then, the reasonable person standard in criminal law differentiates between carelessness or negligence and criminal misconduct. *See State v.*

13

*Albrecht*, 336 Md. 475, 499, 649 A.2d 336, 348 (1994) (citing C.J. Murphy in *Mills v. State*, 13 Md. App. 196, 200, 282 A.2d 147, 149 (1971), *cert. denied*, 264 Md. 750 (1972): ". . . On the other hand whether an accused's conduct constituted gross negligence must be determined by the conduct itself and not by the resultant harm. Nor can criminal liability be predicated on every careless act merely because its carelessness results in injury to another.").

Utilizing the objective standard to evaluate the *actus reus* or conduct of a parent in order to determine a violation of the criminal child neglect statute avoids conjecture with regard to the creation of a substantial risk of harm to the child. The standard to be utilized, then, is whether the parent intentionally failed to provide necessary assistance and resources for the physical needs of the child by acting in a manner that created a substantial risk of harm to the child, measured by that which a reasonable person would have done in the circumstances.

The importance of relying on an objective standard to evaluate parental inaction or neglect lies in the avoidance of "20/20 hindsight" by a jury that can engage in risk distortion. As one commenter on the subject has noted, juries, when faced with evidence of what may have or could have occurred, distort the risk of parental inaction so that all risk becomes substantial. *See* David Pimentel, *Criminal Child Neglect and the "Free Range Kid": Is Overprotective Parenting the New Standard of Care?*, 2012 Utah L. Rev. 947, 988. Professor Pimentel, writing about overprotective parenting, notes that parents, historically, have had little concern for the potential criminality of their parenting decisions, as "the prevailing concern behind parenting choices has been what is best for

14

the child and for the family." *Id.* at 967. The shift toward closer scrutiny of parenting choices—the result of both societal and legislative emphases on child protection—has been accompanied by the media sensationalizing the risk to children, according to Professor Pimentel, such that parenting decisions, which necessarily involve parental management of risk to their children, face second-guessing by jurors tasked with determining whether the conduct was, in fact, criminal. *Id.* at 970-72. Such second-guessing raises the potential that any risk of harm that could be envisioned, aided by 20/20 hindsight, would satisfy criminal culpability in the mind of a jury, according to Professor Pimentel:

> If the risk of harm is literally one in a million—in the category of "freak accident"—it would be patently unreasonable to expect any significant investment in precaution against that harm. And yet, every time that freak accident occurs, the parent may face liability for endangerment, as jurors are likely to take the fact of the harm itself as conclusive evidence of its likelihood[.]

> \* \* \*

> Psychologists who study fear have determined a number of reasons that people misperceive risks. Indeed, they note that "perceived risks rarely match the actual risks."

*Id.* at 981-83.

After discussing the psychology of a juror's assessment of risk and factors that contributed to the distortion between actual and perceived risks,[11] Professor Pimentel

---

[11] Five factors contribute to a juror's distortion of the risk associated with a parent's action or inaction, according to Professor Pimentel: the ability to assess the likelihood of an occurrence based on the ease with which the juror can think of an example of it; the tendency to ignore higher probability, but less catastrophic risks; the exaggeration of a risk when there is a human element introduced; the impact of media coverage, which

concludes that, "As already demonstrated, however, juries are ill-equipped to assess risk, much less to determine when a parent's poor judgment is sufficiently bad to warrant criminal punishment." *Id.* at 987.

The Supreme Court of Kansas, in a child endangerment case, also recognized the potential for bias and distortion in *State v. Cummings*, 305 P.3d 556, 565 (Kan. 2013). In that case, Cummings had provided daycare services for several children in her home and placed one of the children, a thirteen-month old, in a car seat in a bathroom, fastening the child in with the top strap of the car seat but not the bottom strap. *Id.* at 558. After hearing the child cry for a few minutes and then stop, Cummings assumed the child had gone to sleep, but when she finally did check on the child, he had strangled to death in the car seat. *Id.* at 559.

The statute under which Cummings was convicted of the crime of involuntary manslaughter during the commission of the crime of endangering a child defined the crime as "intentionally and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health *may* be injured or endangered." *Id.* at 561 (emphasis original).

Cummings had challenged the jury instruction which stated, in part:

The elements of endangering a child are as follows:

---

overestimates how common a low probability outcome might be; and the lack of appropriate definitions of "reasonable", which increases the likelihood a juror will deem the parent's action unreasonable in light of the other four factors. David Pimentel, *Criminal Child Neglect and the "Free Range Kid": Is Overprotective Parenting the New Standard of Care?*, 2012 Utah L. Rev. 947, 983-87.

> 1. That the defendant intentionally and unreasonably caused or permitted [the child] to be placed in a situation in which there was a reasonable probability that [the child]'s life, body or health would be injured or endangered;

*Id.* at 560-61, arguing the jury should have been told that "reasonable probability" was more than a faint or remote possibility and that the likelihood of harm will result or the child is placed in imminent peril. *Id.* at 561. The Supreme Court of Kansas emphasized the effect of "hindsight bias and risk distortion," reversed Cummings's conviction and held that the term "reasonable probability" was ambiguous:

> The problem associated with this ambiguity is real; a defendant could be convicted based on the jury's misunderstanding of the level of culpability that our endangering a child statute requires. The severity of this problem increases because of hindsight bias and risk distortion.

*id.* at 565.

Similarly, the Ohio intermediate appellate court, in *State v. McLeod*, 946 N.E.2d 915 (Ohio Ct. App. 2006), reversed a conviction for child endangerment based on insufficient evidence. Ohio's child endangerment statute "provide[d] that no person . . . 'shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.'" *Id.* at 917. The term "substantial risk" was also defined by statute as, "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." *Id.*

In the case, McLeod had agreed to watch the five year-old daughter of a friend, along with two younger children of another friend; he took a walk around the apartment complex with the younger children after checking on the girl at the playground. Someone

reported the girl as unattended, and a deputy sheriff found the child. McLeod was charged and convicted of child endangerment.

The Ohio appellate court reversed and noted that "parents or other child caregivers are not criminally liable for every error in judgment[.]" *Id.* at 917. Noting that other parents allowed their children to play unsupervised at the playground, the court concluded that checking on a child who was playing with other children in a playground every thirty minutes did not rise to the level of reckless endangerment and stated:

> The failure to realize an ideal level of supervisory attention of a child does not equate to acting with heedless indifference to the consequences, thereby perversely disregarding a known strong possibility, as contrasted with a remote or significant possibility, of harm to the health or safety of the child.

*Id.* at 918.

In *State v. Anderson*, 108 S.W.3d 680 (Mo. Ct. App. 2002), a mother was convicted of second-degree child endangerment after her seven-year-old child, who was disabled, was found naked on a highway. The Missouri child endangerment statute provided that "[a] person commits the crime of endangering the welfare of a child in the second degree if . . . [s]he with criminal negligence acts in a manner that creates a substantial risk to the life, body or health of a child less than seventeen years old." *Id.* at 682. The State was required to prove that the mother acted with "criminal negligence" that "create[d] a substantial risk to life, body, or health of a child[.]" *Id.*

The Missouri Court of Appeals reversed the mother's conviction and opined that, "[while] the failure to properly supervise a child may constitute child endangerment under certain circumstances[,] . . . in such cases the failure to act must pose an actual or

18

practically certain risk or danger and not just the potential for risk or danger." *Id.* at 683 (internal quotation omitted). The court noted that no evidence had been presented to establish that Anderson failed to supervise her son and that this failure resulted in the child's ending up in the middle of the highway. *Id.* Thus, the court concluded:

> Any finding that Anderson's failure to supervise J.A. posed a substantial and unjustifiable risk of danger to J.A. could not have been based upon anything more than mere speculation and conjecture.

*Id.* Reversing Anderson's conviction, the appellate court stated, "the evidence presented at trial simply does not establish that any failure by Anderson to supervise J.A. posed a substantial risk that J.A. would end up standing in the middle of the highway or that Anderson should have been aware of such a risk." *Id.* at 684.

In the present case, conviction for criminal child neglect requires that Ms. Hall's conduct—leaving her three-year-old son, A., in the care of his fourteen year-old sister—created a "substantial risk of harm" to A.'s physical health and that her conduct was such that a reasonable parent under the circumstances would not have engaged in. The evidence, however, taken in the light most favorable to the State was insufficient to satisfy the standard.

Ms. Hall left her three year-old son, A., a child who was, admittedly, difficult to handle, in the overnight care of his fourteen year-old sister, D., after ensuring that he had been fed and was ready to go to bed. After Ms. Hall and her fiancé departed, the door to the house was locked and the children, including A. and D., fell asleep. The fact that A. was in the care of a fourteen year-old was objectively reasonable taking into

19

consideration that statutorily a thirteen year-old is deemed an appropriate caretaker for a child under eight years of age:

> A person who is charged with the care of a child under the age of 8 years may not allow the child to be locked or confined in a dwelling, building, enclosure, or motor vehicle while the person charged is absent and the dwelling, building, enclosure, or motor vehicle is out of the sight of the person charged unless the person charged provides a reliable person at least 13 years old to remain with the child to protect the child.

Maryland Code (1984, 2012 Repl. Vol.), Section 5-801(a) of the Family Law Article. Although Ms. Hall had agreed with Ms. Wannall not to leave A. under the supervision of D., a fact upon which the Court of Special Appeals relied in its analysis, accord did not convert her agreement to the level of one which had criminal consequences. The main thrust of Ms. Wannall's concern regarding D. and her supervision of A. was D.'s need to "spend more time on her studies" and "not have as many responsibilities in the home." Certainly, also, the agreement between Ms. Hall and Ms. Wannall could not have been the basis of a criminal conspiracy. As a result, although it is beyond dispute that Ms. Hall was negligent in not responding to telephone calls from D. and the authorities, she was not guilty of criminal child neglect.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.**

Circuit Court for Montgomery County,
Maryland
Criminal Case No. 122148
Argued: January 11, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 50

September Term, 2015

_____

BEVERLY ANNETTA HALL
v.
STATE OF MARYLAND

_____

Barbera, C.J.,
*Battaglia,
Greene,
Adkins,
McDonald,
Watts,
Hotten,

JJ.

_____

Concurring Opinion by McDonald, J.,
which Barbera, C.J., joins

_____

Filed: June 23, 2016

*Battaglia, J., now retired, participated in the
hearing and conference of this case while an active
member of this Court; after being recalled pursuant
to the Constitution, Article IV, Section 3A, she also
participated in the decision and adoption of the
majority opinion.

I agree with the analysis in the Majority Opinion and join it in full. I write separately to elaborate on what I understand the Majority Opinion to mean in two respects.

*Determination as to Vagueness*

The Majority Opinion holds that the evidence was insufficient to support Ms. Hall's conviction for criminal child neglect, but it explicitly avoids addressing whether the statute prohibiting criminal neglect of a minor is unconstitutionally vague. Majority slip op. at 2. In my view, the former holding necessarily entails a decision that the statute is not unconstitutionally vague. For the Court to hold that the evidence is insufficient to support a guilty verdict, the Court must conclude that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Moye v. State*, 369 Md. 2, 12, 796 A.2d 821 (2002). A statute is unconstitutionally vague if it would not afford a person "of ordinary intelligence and experience . . . a reasonable opportunity to know what is prohibited . . . ." *Galloway v. State*, 365 Md. 599, 615, 781 A.2d 851 (2001). If the statute were unconstitutionally vague, then a trier of fact would not know what the essential elements of the crime were and we could not reach a conclusion, one way or the other, whether the trier of fact could have found that the elements of the offense were proven.

Thus, in order to conclude, as the Majority opinion does, that no rational trier of fact could have found the essential elements of the crime from the evidence here, we necessarily must be able to identify the elements of the offense and have surmounted the

vagueness hurdle. For the reasons that Judge Hotten's dissent ably explains, I do not believe that the statute is unconstitutionally vague. However, for the reasons that the Majority Opinion elucidates, I do not believe the evidence was sufficient to support the conviction.

### *A Before-the-Fact Standard*

Additionally, I understand the Majority Opinion to apply a before-the-fact standard, rather than an after-the-fact standard. According to the statute, we must examine whether Ms. Hall's actions created a "substantial risk" of harm to A. *See* Maryland Code, Criminal Law Article, § 3-602.1. We must guard against considering the risk of a harm to be substantial merely because we know, after the fact, that some harm materialized. The proper inquiry is whether the risk should be considered substantial at the time that the parent or other caretaker acted. One who creates a very small risk of harm to a child is not criminally negligent simply because an unforeseeable tragedy follows. On the other hand, a parent or caretaker may be criminally negligent when that individual creates a substantial risk of harm, whether or not the harm actually befalls the child. In this case, this standard means that we consider what Ms. Hall could be reasonably expected to foresee as possible outcomes of leaving A. at home with D. Whether A. in fact ran out of the house afterward or stayed on the couch sleeping all night is not relevant; what matters is whether Ms. Hall's actions created a substantial risk, not what harm actually ensued. I understand the Majority Opinion's analysis to apply this standard, so I concur.

Chief Judge Barbera has indicated that she joins this opinion.

2

Circuit Court for Montgomery County, Maryland
Criminal Case No. 122148
Argued: January 11, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 50

September Term, 2015

_____

BEVERLY ANNETTA HALL

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
*Battaglia,
Greene,
Adkins,
McDonald,
Watts,
Hotten,

JJ.

_____

Dissenting Opinion by Hotten, J., which
Greene and Watts, JJ., join

_____

Filed: June 23, 2016

*Battaglia, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after bring recalled
pursuant to the Md. Constitution, Article IV,
Section 3A, she also participated in the decision
and adoption of the majority opinion.

I respectfully dissent from the majority opinion. I would hold that the evidence at trial, when viewed in a light most favorable to the State, was sufficient to satisfy § 3-602.1 of the Criminal Law Article ("Crim. Law"), which was not unconstitutionally vague as applied to Ms. Hall ("Petitioner").

## I.     The Evidence at Trial was Sufficient to Sustain Petitioner's Conviction.

Crim. Law § 3-602.1 required that Petitioner's conduct "created a 'substantial risk of harm' to A.'s physical health and that her conduct was such that a reasonable parent under the circumstances would not have engaged in." Maj. Slip Op. at 19. Here, notwithstanding the statutory acknowledgement that "a thirteen year-old is... an appropriate caretaker for a child under eight years of age[,]" Maj. Slip Op. at 20, the direct and circumstantial evidence before the court was sufficient to establish that Petitioner knew D. was an inappropriate caretaker for A. *Allen v. State,* 402 Md. 59, 76-77, 935 A.2d 421, 431 (2007) ("[W]e review a challenge to the sufficiency of the evidence in a jury trial by determining whether the evidence, viewed in a light most favorable to the prosecution, supported the conviction ..., such that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). Thus, Petitioner's decision to leave A. with D. overnight, when she was unreachable until late the following morning, was not "objectively reasonable" as proffered by the majority. Maj. Slip Op. at 19.

D.'s testimony revealed that A. had a propensity to escape from home unattended, and, the social worker, Ms. Wannall established that Petitioner was present for at least one such incident where A. had escaped from the home and entered the truck of a nearby postal worker. Ms. Wannall further described a typical episode of A's rambunctious behavior in

Petitioner's presence, and opined that A. "ran rampant[,]" "was very, very difficult to control[,]" and was "very active." Regarding direct evidence of Petitioner's knowledge, Ms. Wannall testified that a recurring theme during her conversations with Petitioner was the appropriateness of D. caring for A. Notably, Ms. Wannall raised this issue with Petitioner just nine days prior to the night in question, and Petitioner had agreed that "[A.] was too difficult for [D.] to watch[,]" and that she would no longer leave A. under the supervision of D.

The majority proffers that the Court of Specials Appeals' reliance on this agreement was misplaced because "[t]he main thrust of Ms. Wannall's concern regarding D. and her supervision of A. was D.'s need to 'spend more time on her studies' and 'not have as many responsibilities in the home.'" Maj. Slip Op. at 20. Although the majority's interpretation of Ms. Wannall's concern is certainly reasonable, nothing in the record indicates that Ms. Wannall's concerns were limited to the amount of responsibility placed on D. Thus, where this Court is required to "review the evidence and all inferences in a light most favorable to the State[,]" Ms. Wannall's concern should be viewed as pertaining to the wellbeing of both A. and D. *Allen,* 402 Md. at 77, 935 A.2d at 431. Petitioner's agreement with Ms. Wannall was, therefore, probative of Petitioner's knowledge that D. was incapable of providing adequate care for A.

Notwithstanding Petitioner's knowledge that D. was ill-suited to supervise A., Petitioner advised her children that she "would be right back[,]" and then left A. under D.'s supervision on the night of February 24, 2012. Petitioner did not tell her children where she could be found, did not tell them when she would be back, and made no efforts to

- 2 -

reconnect with her children until after 10am the following morning. Furthermore, despite giving D. a cell phone to use in the event of an emergency,[1] Petitioner was entirely unavailable, as her cell phone went straight to voicemail during the numerous unsuccessful attempts by D., law enforcement, and the social worker to contact her after A. was found unattended in the middle of a six lane roadway.

The factfinder could have reasonably concluded "that [Petitioner's] conduct…created a 'substantial risk of harm' to A.'s physical health and that her conduct was such that a reasonable parent under the circumstances would not have engaged in." Maj. Slip Op. at 19. The majority correctly observes that 20/20 hindsight should not be utilized to hold a parent criminally liable for "failure to realize an ideal level of supervisory attention" or to safeguard against a "freak accident." Maj. Slip Op. at 18, 15 (quoting *State v. McLeod*, 946 N.E.2d 915, 918 (Ohio Ct. App. 2006), and David Pimentel, *Criminal Child Neglect and the "Free Range Kid": Is Overprotective Parenting the New Standard of Care?*, 2012 Utah L. Rev. 947, 981-83). However, the evidence that Petitioner knew A. was a very difficult child, coupled with her complete unavailability, distinguishes this case from one where an otherwise reasonable parenting decision is judged with the benefit of hindsight.

The factfinder could have reasonably concluded—in light of Petitioner's knowledge concerning A.'s behavior—that Petitioner's conduct was not that of a reasonable parent under the circumstances. Furthermore, A. was subjected to a "substantial risk of harm"

---

[1] The cell phone provided contained a number to reach Petitioner.

from the moment he was left with an inadequate caregiver, while Petitioner was unreachable by her children, police, and the social worker. I would therefore hold that the evidence was sufficient to sustain Petitioner's conviction.

## II. § 3-602.1 is Constitutional As Applied to Petitioner

Having addressed Petitioner's sufficiency argument, I would further hold that Crim. Law § 3-602.1 was not unconstitutionally vague as applied to Petitioner.[2]

The void-for-vagueness doctrine grows out of the right to due process under the Fourteenth Amendment to the United States Constitution, and generally requires that a criminal statute satisfy two criteria. *Ayers v. State*, 335 Md. 602, 623-24, 645 A.2d 22, 32 (1994). The first criteria is notice, requiring that "persons of ordinary intelligence and experience be afforded a reasonable opportunity to know what is prohibited, so that they may govern their behavior accordingly." *Bowers v. State*, 283 Md. 115, 121, 389 A.2d 341, 345 (1978). This requirement "is grounded on the assumption that one should be free to choose between lawful and unlawful conduct." *Id.*

The second criteria requires that the statute "provide legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws." *Id*. This Court has observed that "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and

---

[2] The vagueness challenge is addressed in this dissent because affirmance of the judgment of the Court of Special Appeals would require resolution of this constitutional issue. *Cf. VNA Hospice of Maryland v. Dep't of Health & Mental Hygiene*, 406 Md. 584, 604, 961 A.2d 557, 569 (2008) (discussing this Court's preference "'to decide constitutional issues only when necessary.'") (citations omitted).

juries for resolution on an Ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 121-22, 389 A.2d. at 345 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-109, 92 S. Ct. 2294, 2299 (1972) *accord*, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170, 92 S. Ct. 839, 843 (1972)).

Outside of the First Amendment context, vagueness is generally considered "as applied to the facts of the particular case[,]" and the court will determine whether the complaining party could have reasonably foreseen that *their* conduct was subject to the statute, and/or whether the statute led to arbitrary enforcement *based on the facts before the court*.[3] *Ayers*, 335 Md. at 624, 645 A.2d at 33 (quoting *Bowers*, 283 Md. at 121, 389

---

[3] In contrast to a challenge for vagueness as-applied, a facial challenge permits the complaining party to raise the issue of vagueness as to hypothetical persons not before the court, "[a]nd if the law is found deficient in one of these respects, it may not be applied to the [complainant] either[.]" *Coates v. City of Cincinnati,* 402 U.S. 611, 619-20, 91 S. Ct. 1686, 1691 (1971). Several Federal Circuits, including the Fourth Circuit, and several State Courts, have expressly prohibited a facial attack in the absence of a concern for First Amendment liberties. *United States v. Klecker*, 348 F.3d 69, 71 (4th Cir. 2003); *see also United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002); *Gallagher v. City of Clayton*, 699 F.3d 1013, 1021 (8th Cir. 2012) ('It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand."); *United States v. Other Med.*, 596 F.3d 677, 682 (9th Cir. 2010) ("[V]agueness challenges to statutes that do not involve the First Amendment violations must be examined as applied to the defendant."); *In re Dependency of M.M.*, 174 Wash. App. 1068 (2013) ("It is well-settled law that a vagueness challenge to a statute that does not involve First Amendment rights must be decided as applied to the particular facts of a case. As a result, when a vagueness challenge to a statute does not involve First Amendment interests, a facial challenge to the statute will not be considered.") (footnote omitted); *People v. Einoder*, 209 Ill. 2d 443, 448 (2004) ("A defendant may not challenge the facial vagueness of a statute that does not implicate first amendment freedoms unless the statute 'is incapable of *any* valid application.'"); *State v. Schriver*, 207 Conn. 456, 461 (1988) ("For statutes that do not implicate the especially sensitive concerns embodied in

A.2d at 346). Thus, Crim. Law § 3-602.1's definition of "neglect"—the "intentional failure to provide necessary assistance and resources for the physical needs … of a minor that creates a substantial risk of harm to the minor's physical health[]"— must satisfy each of these prongs.[4]   Crim. Law §3-602.1(a)(5)(ii).

In determining whether the child neglect statute provided Petitioner with adequate notice of the prohibited conduct, the court examines whether that language can be "fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess common and generally accepted meaning." *Galloway v. State*, 365 Md. 599, 615, 781 A.2d 851, 860 (2001) (citation omitted) (emphasis in original).  If, after looking to the above sources, there is still a constitutional question about notice, the court may also employ a narrowing construction to avoid constitutional concerns.  *See Id.* at 619, 781 A.2d at 862 ("In short, even if arguably otherwise deficient, [the challenged statute] is salvageable because we shall employ a

---

the first amendment, we determine the constitutionality of a statute under attack for vagueness by considering its application to the facts at issue.") (citation omitted).

[4] In discussing jury instructions, the parties agreed that the references to mental health in the definition of "neglect" would be removed.  Thus, the instructions given by the court defined "neglect" as "the intentional failure to provide necessary assistant [(sic)] and resources for the physical needs of a minor that creates the substantial risk of harm to the minor's physical health."  We are therefore solely concerned with neglect committed through "intentional failure to provide necessary assistance and resources for the physical needs of a minor that creates a substantial risk of harm to the minor's physical health[,]" because the State did not prosecute Petitioner under the portion of Crim. Law § 3-602.1 governing mental health. *See Ayers*, 335 Md. at 625, 645 A.2d at 33 ("[E]ven under the special standing rule applicable with regard to statutes involving First Amendment interests, a defendant may not raise a facial challenge to portions of a statute under which he or she was not convicted.").

limiting construction to the statute to ensure that it provides a standard of conduct…."); *see also Schochet v. State*, 320 Md. 714, 729, 580 A.2d 176, 183 (1990) ("General Statutes …, which if given their broadest and most encompassing meaning, give rise to constitutional questions, have regularly been the subject of narrowing constructions so as to avoid the constitutional issues[.]").  Lastly, in determining whether an otherwise vague statute is salvageable, the court considers the existence of inherent limitations in the statute, along with any scienter requirement that further provides notice of the prohibited conduct. *Galloway*, 365 Md. at 619, 781 A.2d at 863.  In light of these factors, the meaning of the terms in Crim. Law § 3-602.1 could be fairly ascertained by Petitioner, thus providing notice of the prohibited conduct.

Crim. Law § 3-602.1(a)(5)(ii) prohibits the "*intentional* failure to provide necessary assistance and resources...."  (emphasis added).  Intent is frequently used as the required *mens rea* in Maryland's penal statutes.  In the context of second degree murder—requiring an "[i]ntent to commit grievous bodily harm"—this Court has noted that the intent requirement may be satisfied where "the defendant acts without provocation, justification or excuse, and could or should have foreseen that the consequences of his or her conduct might result in death to another person." *Thornton v. State*, 397 Md. 704, 714-15, 919 A.2d 678, 684 (2007) (citation omitted) (emphasis added).  Regarding the intent to cause serious physical injury required for first degree assault, "a jury may infer the necessary intent from an individual's conduct and the surrounding circumstances, whether or not the victim suffers such an injury." *Chilcoat v. State*, 155 Md. App. 394, 403, 843 A.2d 240, 246 (2004) (citing *Ford v. State,* 330 Md. 682, 703, 625 A.2d 984, 994 (1993)).  "Also, the jury

- 7 -

may 'infer that one intends the natural and probable consequences of his act.'" *Id.* (quoting *Ford*, 330 Md. at 704, 625 A.2d at 994).

In light of the precedent interpreting "intent" in other criminal statutes, Petitioner would have been placed on notice that Crim. Law § 3-602.1 may be satisfied where a defendant could or should have foreseen that his or her conduct would probably result in the "failure to provide necessary assistance and resources for the physical needs of a minor…."[5] Crim. Law § 3-602.1(a)(5)(ii). This specific intent requirement weighs against a holding that Crim. Law § 3-602.1 punishes parents or caregivers without warning, *see Williams v. State*, 329 Md. 1, 9, 616 A.2d 1275, 1279 (2001) ("'[T]he requirement of a specific intent to do a prohibited act … relieve[s] the statute of the objection that it punishes without warning an offense of which the accused was unaware.'") (quoting *Screws v. United States*, 325 U.S. 91, 101-02, 65 S. Ct. 1031, 1035 (1945) (plurality opinion)), and also distinguishes the present case from several out-of-state cases where child neglect statutes have been deemed unconstitutionally vague. *Cf. Commonwealth v. Carter*, 21 Va. App. 150, 152-53 (1995) (holding that Virginia Code § 40.1-103—making it a crime for "any person employing or having custody of any child … willfully or negligently to cause

_____

[5] At Petitioner's trial, the court instructed the jury using the following explanation of "intent":

> Intent is a state of mind, and ordinarily cannot be proven directly because there is no way of looking into a person's mind; therefore, a defense [(sic)] intent may be shown by surrounding circumstances. In determining the defendant's intent, you may consider the defendant's acts and statements, as well as surrounding circumstances. Further, you may, but are not required to, infer that a person ordinarily intends the natural and probably [(sic)] consequences of her acts and or omissions.

or permit such child to be placed in a situation that its life, health or morals may be endangered…"—was unconstitutionally vague) (emphasis omitted); *Schriver*, 207 Conn. at 461 (noting that a prohibition on "any act likely to impair the health or morals of any child[]" "provides no guidance to potential violators, police officers or juries, particularly because specific intent is not an element of the offense…."); *Alsager v. Dist. Court of Polk Cnty. Iowa (Juvenile Div.)*, 406 F. Supp. 10 (S.D. Iowa 1975) *aff'd sub nom. Alsager v. Dist. Court of Polk Cnty., Iowa*, 545 F.2d 1137 (8th Cir. 1976) (holding that Iowa Code § 232.41—providing that the court may terminate a parental relationship where "the parents have substantially and continuously or repeatedly refused to give the child necessary parental care and protection"—was unconstitutionally vague.).

Regarding "intentional failure to provide necessary assistance and resources *for the physical needs* … of a minor…[,]" Crim. Law § 3-602.1 (emphasis added), the term "physical needs," will determine "necessary assistance and resources" in a given case. The term "needs," when used as a noun, is defined as the "physiological or psychological requirements for the well-being of an organism." M. WEBSTER'S NEW COLLEGIATE DICTIONARY 829 (11th ed. 2008). Thus, the term "physical needs" simply excludes the "psychological requirements," and includes basic requirements for physical well-being of a child, like shelter, safety, food, supervision, clothing, water or sanitation.[6]

The common understanding of "physical needs" is confirmed by the General Assembly's use of similar terms in Maryland's elder abuse and neglect statute, Crim. Law

---

[6] The examples listed are not intended to be exhaustive.

§ 3-604(a)(7)(i). In addition, case law interpreting the term "neglect" in Maryland's Child In Need of Assistance statute, Md. Code (2006 Repl. Vol. 2013), § 3-801(s) of the Courts and Judicial Proceedings ("Cts. & Jud. Proc.") Article, provides additional notice of what is encompassed by the term "neglect" in the case at bar.

Similar to the child neglect statute, Crim. Law § 3-604(a)(7)(i) defines "neglect" of a vulnerable adult as the:

> intentional failure to provide necessary assistance and resources for the physical needs of a vulnerable adult, including:
>
>> 1. food;
>> 2. clothing;
>> 3. toileting;
>> 4. essential medical treatment;
>> 5. shelter; or
>> 6. supervision.

Although Crim. Law § 3-602.1 contains no specific examples of what is included amongst the "physical needs of a minor," the specific examples of "the physical needs of a vulnerable adult" confirm the types of essentials that are encompassed by the common understanding of "physical needs." According to Petitioner, the General Assembly's decision to define what is necessary for the physical needs and resources of a vulnerable adult also indicates that the term "necessary assistance and resources for the physical needs" is a vague term. However, several out-of-state courts, in addressing vagueness challenges, have looked to definitions provided in related statutes to determine whether there is notice of a term's meaning in the law at issue. *See State v. Hagan*, 387 So. 2d 943, 945 (Fla. 1980) ("In the absence of a statutory definition, resort may be had to case law or related statutory provisions which define the term, and where a statute does not specifically

define words of common usage, such words are construed in their plain and ordinary sense."); *Com. v. Kenney*, 449 Mass. 840, 851 (2007) ("[A] law is not vague [in the constitutional sense] if its meaning is ascertainable by reference to similar or related statutes ... if the questioned [term has] a commonly understood meaning [or if] even a vague statute may be made constitutionally definite by giving it a reasonable construction."); *People v. Kassover*, 205 N.Y.S.2d 428, 431 (N.Y. Sp. Sess. 1960) ("The fact that language in a statute or regulation may require reference to 'definitions' in that or in a related statute, does not necessarily render such statute or regulation vague or indefinite."); *State v. Winslow*, 134 N.H. 398, 400 (1991) ("[T]he necessary specificity, however, need not be contained in the statute itself, but rather, the statute in question may be read in the context of related statutes, prior decisions, or generally accepted usage.").

There is also good reason for the General Assembly to paint with a broader brush when drafting the child abuse statute. A "vulnerable adult" is defined in terms of a condition—"an adult who lacks the physical or mental capacity to provide for the adult's daily needs[,]" Crim. Law § 3-604(a)(10)—so there is likely a somewhat finite understanding of what is required for the physical needs of such a person. To the contrary, a minor (anyone under the age of 18) is defined by reference to age, and there are minors within this range that require drastically different levels/types of assistance to meet their physical needs. Therefore, the term "necessary assistance and resources for the physical needs" is susceptible to a definition with concrete examples in Crim. Law § 3-604, but not in Crim. Law § 3-602.1.

- 11 -

The amendments made to S.B. 178 (Md. 2011), which ultimately created Crim. Law § 3-602.1, reveal that the General Assembly recognized the difficulty involved in drafting legislation comprehensive enough to encompass all that is necessary for the physical needs of a minor, as compared to a vulnerable adult. As S.B. 178 was originally introduced in the Senate, "neglect" was defined in the exact same manner as the vulnerable adult statute: "the intentional failure to provide necessary assistance and resources for the physical needs of a minor, including:"

    (I)  Food

    (II)  Clothing

    (III)  Toileting

    (IV)  Essential Medical treatment

    (V)  Shelter; or

    (VI)  Supervision

S.B. 178 (as introduced and first read in the Senate, January 24, 2011) (capitalization omitted). However, S.B. 178 was subsequently approved with amendments by the Senate Judicial Proceedings Committee, which deleted the "laundry list (food, clothing, toileting, essential medical treatment, shelter or, or supervision)[,]" and instead "require[d] that the failure to provide creates a substantial risk of harm to the minor's physical or mental health[.]" SENATE JUDICIAL PROCEEDINGS COMMITTEE: FLOOR REPORT, S.B. 178 at 1 (Md. 2011). This comprehensive definition of "neglect" in S.B. 178 was ultimately signed into law, and the decision to deviate from the definition of "neglect" in the vulnerable adult statute evidences the General Assembly's intent to encompass a range

- 12 -

of conduct that was not limited by the "laundry list" used in the vulnerable adult statute. *See Williams,* 329 Md. at 13, 616 A.2d at 1280-81 (noting that "all broad laws attempting to punish a range of criminal conduct" are not "susceptible to vagueness challenges insofar as they could be drawn more narrowly and precisely.").

In addition to the vulnerable adult statute, "neglect" is also defined in a similar fashion in the Maryland Child In Need of Assistance ("CINA") statute. Cts. & Jud. Proc. § 3-801(s). Petitioner contends that the body of law addressing "neglect" in CINA cases is of limited relevance because Crim. Law § 3-602.1 is a criminal statute designed to punish caregivers, whereas a CINA proceeding is a civil proceeding that serves to protect minors. Petitioner also notes that the language of the statutes are different. It is true that a criminal proceeding serves an interest not necessarily served by a CINA proceeding because "the legislative intention underlying a CINA proceeding is not to punish the parent[.]" *In re Blessen H.*, 392 Md. 684, 707-09, 898 A.2d 980, 994 (2006) (quoting *In re John P. and Thomas P.*, 311 Md. 700-709, 537 A.2d 263, 268 (1988)). Furthermore, while the void-for-vagueness doctrine applies to both criminal and civil statutes, the Supreme Court has noted that the U.S. Constitution is more tolerant of vagueness in civil enactments than criminal enactments. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498-99, 102 S. Ct. 1186, 1193 (1982) ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.") (footnote omitted).

Notwithstanding these differences, a determination that a child is a CINA and a finding of guilt under Crim. Law § 3-602.1 both serve the legitimate State interest of

protecting Maryland children. Additionally, although the results of the two proceedings will be different, each constitutes an interference with the fundamental constitutional right of a parent to raise their child how they see fit. *In Re Yve S.*, 373 Md. 551, 565, 819 A.2d 1030, 1038-39 (2003) (discussing the fundamental rights of a parent in relation to their child). Thus, notice of the conduct sufficient to constitute neglect under the CINA statute is certainly relevant in providing notice of the conduct comprising criminal neglect, as the statutes are related in both purpose and result.

CINA refers to "a child who requires court intervention because: (1) [t]he child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) [t]he child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Cts. & Jud. Proc. § 3-801(f). Cts. & Jud. Proc. § 3-801(s) defines "neglect" for CINA purposes as:

> the leaving of a child unattended or other failure to give proper care and attention to a child by any parent or individual who has permanent or temporary care or custody or responsibility for supervision of the child under circumstances that indicate:
>
> (1) That the child's health or welfare is harmed or placed at substantial risk of harm; or
>
> (2) That the child has suffered mental injury or been placed at substantial risk of mental injury.

"[P]roper care and attention" is certainly a more nebulous standard than "necessary assistance and resources for the physical needs of the child," yet this definition of "neglect" has been used in Cts. & Jud. Proc. § 3-801(s) since 2001, S.B. 660 (Md. 2001), and has

- 14 -

never been declared unconstitutionally vague in a reported opinion by this Court or the Court of Special Appeals.[7]

Additionally, although not determinative on this issue of vagueness in the case at bar, there is a multitude of cases applying the CINA definition of "neglect," or discussing neglect in the CINA context. *See In re Priscilla B.*, 214 Md. App. 600, 631-32, 78 A.3d 500, 519-20 (2013) (discussing multiple factors supporting a trial court's determination that Priscilla was a CINA on the basis of neglect, including the condition of the home, Priscilla's appearance, and the lack of attention to Priscilla's medical needs); *Doe v. Allegany Cty. Dep't of Soc. Servs.*, 205 Md. App. 47, 52, 43 A.3d 1071, 1074 (2012) (finding that a seventeen-year-old boy with paralysis from the waist down had been neglected where his adoptive parents had refused to allow him back in their house, thus depriving him of the medical assistance he required.); *In re Adoption of Cadence B.*, 417 Md. 146, 150, 9 A.3d 14, 17 (2010) (discussing neglect where the parent had smoked drugs in the presence of the child determined to be a CINA). These cases provide additional notice of the point at which the State will interfere with ordinarily protected parenting decisions, thereby reinforcing the conclusion that Crim. Law § 3-602.1's definition of "neglect" is not unconstitutionally vague.

---

[7] According to a committee note in S.B. 660, the definition of neglect was added to the CINA statute in 2001 "to coincide with the definition in [§ 5-701 of the Family Law Article] and reflects practice in this area of law." The Family Law Article has used a definition of "neglect" similar to the one now used in the CINA statute since 1988. S.B. 708 (Md. 1987).

Regarding the child neglect statute, the "the necessary assistance and resources for the physical needs of a minor" depends on what "is needed or required for the physical well being" of the particular child, who may be seventeen, or in the case of A., three. *See* M. WEBSTER'S NEW COLLEGIATE DICTIONARY at 828 (defining "necessary" as that which is "absolutely needed" or "required"). However, there is no constitutional problem with this fact-intensive standard, as the vagueness doctrine of the Fourteenth Amendment:

> is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.

*Eanes v. State*, 318 Md. 436, 459, 569 A.2d 604, 615 (1990) (quoting *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S. Ct. 1953, 1957 (1972). This Court is only concerned with whether a person "of common intelligence" must "guess at [the statute's] meaning," and a person of common intelligence need not guess at what is necessary, or required, for the physical needs of the child under their supervision. *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 607, 93 S. Ct. 2908, 2913 (1973)).

Regarding the requirement that the failure to provide necessary assistance or resources "creates a substantial risk of harm to the minor's physical health[,]" "substantial risk" has a commonly accepted meaning and appears throughout Maryland's penal statutes. *Cf. State v. Mahurin*, 799 S.W.2d 840, 842 (Mo. 1990) (holding that Missouri's child endangerment statute provided notice of the prohibited act, and reasoning that "[t]he words 'substantial risk' have a plain and ordinary meaning cognizable by a person of ordinary

intelligence."); *see, e.g.*, Crim. Law § 3-204(a)(1) (reckless endangerment); Crim. Law § 3-202 (assault in the first degree) Crim. Law § 3-1001(c) (threats to commit crimes of violence); Crim. Law § 3-201(d) (defining "serious physical injury" and "physical injury that… creates a substantial risk of death[.]").  Whether a substantial risk has been created involves "an objective assessment of the degree of risk" created by the failure to provide necessary assistance and resources to the minor.  *Cf. Minor v. State*, 326 Md. 436, 442, 605 A.2d 138, 141 (1992) (Noting that, whether the defendant has created the "substantial risk of death or serious physical injury" required under the reckless endangerment statute, "entails an objective assessment of the degree of risk presented by the defendant's reckless conduct.").

Regarding this objective assessment, the majority appropriately borrows from the reckless endangerment statute, Crim. Law § 3-204(a)(1), to note that the creation of a substantial risk of harm "is measured by that which a reasonable person would have done in the circumstances."  Maj. Slip Op. at 12-14 (discussing *Jones v. State*, 357 Md. 408, 427, 745 A.2d 396, 406 (2000), and *Williams v. State*, 100 Md. App. 468, 481, 641 A.2d 990, 996 (1994)).  This construction of Crim. Law § 3-602.1—imposing a measure of objective reasonableness on the *actus reus* of "creation of a substantial risk"— allows a member of society to choose between lawful and unlawful conduct by adherence to a familiar standard of conduct.  This standard also provides a safeguard against the use of hindsight to prosecute caregivers in scenarios where a minimum risk of harm materializes, notwithstanding the reasonableness of the caregiver's actions.

In light of the above, I would hold that the standard of conduct prescribed by Crim. Law § 3-602.1 could be fairly understood by Petitioner. As discussed in further detail in Section I, *supra*, Petitioner was fully aware that A. was a difficult child, and conceded that it was inappropriate for D. to supervise A. Petitioner would therefore have been placed on notice that leaving A. with D. overnight, without any way for D. to contact Petitioner, would likely deprive A. of the necessities for his physical well-being, and that doing so was not "objectively reasonable[.]" Maj. Slip Op. at 19.

I would further hold that Crim. Law § 3-602.1 provided a fixed standard that, from the perspective of law enforcement, was clearly applicable to Petitioner's conduct. According to Petitioner, the fact that Officer Walsh, after finding A. at the playground without supervision on February 22, 2012, returned A. home with only D. and M. present, "illustrates the lack of guidance the statute provides to law enforcement."

To the contrary, I believe law enforcement's actions were reflective of the scienter requirement in the child neglect statute. As discussed in detail above, Crim. Law § 3-602.1 required that Petitioner should have foreseen that her conduct would likely result in the "failure to provide necessary assistance and resources for the physical needs … of a minor[.]" Crim. Law § 3-602.1(a)(5)(i). In light of this *mens rea* requirement, it is highly likely that law enforcement personnel, in this case Officer Walsh, would not know that a crime had been committed until more circumstances regarding an individual case were ascertained. This is because a child may be found in a situation where, despite the absence of criminal neglect, there was a substantial risk to the child's physical health. Therefore, it is entirely reasonable that Officer Walsh, when discovering A. at the park, would not

- 18 -

know that a crime has been committed until he became aware of the circumstances that reflected a lack of child supervision. Accordingly, there was no reason to believe that a law enforcement officer who returned A. to D.'s supervision, and waited to consult with social workers before pursuing charges under Crim. Law § 3-602.1, was left without "adequate guidelines" for enforcement of the statute. Officer Walsh's actions simply reflect that Crim. Law § 3-602.1 insulates innocent parenting mistakes from criminal liability.

In summation, I would hold that Crim. Law § 3-602.1 was not unconstitutionally vague as applied to Petitioner, and that the evidence was sufficient to sustain Petitioner's conviction.

Greene and Watts, JJ., authorized me to state they join in this opinion.